**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 14-1469
_____

CRAIG WILLIAMS,
                                         Appellant

v.

SECRETARY PENNSYLVANIA DEPARTMENT OF
CORRECTIONS; DORINA VARNER, Chief Grievance
Coordinator; TINA FRIDAY, Records Officer, in her
individual and official capacity; JEFFREY R. ROGERS,
Manager, in his individual and official capacity; TRACY
SHAWLEY, Grievance Coordinator, in her individual and
official capacity; LOUIS FOLINO, in his individual and
official capacity

_____

APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE WESTERN DISTRICT
OF PENNSYLVANIA
(No. 2-12-cv-00944)
District Judge: Honorable Mark R. Hornak

_____

No. 15-1390
_____

SHAWN T. WALKER,
                    Appellant
v.

MICHAEL A. FARNAN; SECRETARY PENNSYLVANIA
DEPARTMENT OF CORRECTIONS; SUPERINTENDENT
GRATERFORD SCI; CINDY G. WATSON, and others to be
named later
_____


APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE EASTERN DISTRICT
OF PENNSYLVANIA
(No. 2-07-cv-04977)
District Judge: Honorable R. Barclay Surrick
_____

Argued
April 18, 2016
_____

Before: McKEE*, *Chief Judge*, FUENTES*, and ROTH, *Circuit Judges*.

(Opinion Filed:  February 9, 2017)
_____


James J. Bilsborrow, Esq. **[ARGUED]**
Weitz & Luxenberg
700 Broadway
New York, NY 10003

*Attorney for Appellants*

John G. Knorr, III, Esq. **[ARGUED]**
Office of Attorney General of Pennsylvania
Strawberry Square
Harrisburg, PA 17120

Kemal A. Mericli, Esq.
Office of Attorney General of Pennsylvania
564 Forbes Avenue
6th Floor, Manor Complex
Pittsburgh, PA 15219

_____

* Judge McKee was Chief Judge at the time this appeal was argued.  Judge McKee completed his term as Chief Judge on September 30, 2016.
* Judge Fuentes assumed senior status on July 18, 2016.

Randall J. Henzes, Esq.
Claudia M. Tesoro, Esq.
Office of Attorney General of Pennsylvania
3rd Floor
21 South 12th Street
Philadelphia, PA 19107

*Attorneys for Appellees*

_____

OPINION OF THE COURT
_____

McKEE, *Circuit Judge*.

## I. INTRODUCTION

We are asked to decide whether there is a constitutionally protected liberty interest that prohibits the State from continuing to house inmates in solitary confinement[1] on death row after they have been granted resentencing hearings, without meaningful review of the continuing placement. For the reasons set forth below, we conclude that there is and that the Due Process Clause of the Fourteenth Amendment therefore limits the State's ability to subject an inmate to the deprivations of death row once the death sentence initially relied upon to justify such extreme

_____

[1] This level of confinement is also sometimes referred to as "administrative segregation."

restrictions is no longer operative.[2]  However, we also hold that, because this principle was not clearly established before today, the prison officials ("Defendants") in this consolidated appeal are entitled to qualified immunity.

Accordingly, we will affirm the district courts' grants of summary judgment in favor of Defendants based on qualified immunity.  In reaching this conclusion, we stress that this liberty interest, as explained more fully below, is now clearly established.

## II. FACTS AND PROCEDURAL HISTORY

Craig Williams and Shawn T. Walker ("Plaintiffs")[3] are inmates in the custody of the Pennsylvania Department of Corrections ("DOC").  Each was sentenced to death and housed on the death row of his respective institution following imposition of his death sentence.  Eventually, their death sentences were vacated, but several years elapsed before they were resentenced to life without parole.[4]  In the

---

[2] Plaintiffs have both had their death sentences vacated but were nevertheless detained in solitary confinement on death row.  We take no position on whether any inherent risk posed by inmates whose death sentences are still active and viable is sufficient to raise a presumption that their continued confinement on death row is justifiable.

[3] This Court consolidated Williams's and Walkers' appeals. We thank James J. Bilsborrow, Esq., appointed counsel, for his *pro bono* representation of Plaintiffs in this matter.

[4] "Vacated" as used throughout this opinion refers to situations where a defendant has initially been sentenced to

interim, Plaintiffs were kept on death row until their appeals were finally decided. Accordingly, they spent several years in the solitary confinement of death row from the date their death sentences were vacated, until they were finally resentenced to life imprisonment and placed in the general population.[5]

After their sentences were vacated, each Plaintiff brought suit seeking damages[6] from various DOC officials.[7]

---

death, but has subsequently been granted a new sentencing hearing.

[5] As defined by DOC policy, the "general population" is a "status of confinement for an inmate who is not in Administrative or Disciplinary Custody or other type of special housing." DC-ADM 802, Administrative Custody Procedures, JA at 94 ¶E.

[6] Walker sued Defendants in their individual capacities. He initially sought injunctive and declaratory relief in addition to damages. His transfer from death row mooted all but his damages claim. *See Sutton v. Rasheed*, 323 F.3d 236, 248 (3d Cir. 2003) (per curiam) ("An inmate's transfer from the facility complained of generally moots the equitable and declaratory claims.").

[7] Williams sued Defendants in their individual and official capacities. He filed suit against John Wetzel, Secretary Pennsylvania DOC; Dorina Varner, Chief Grievance Coordinator; Tina Friday, Records Officer; Jeffrey R. Rogers, Program Manager; Tracy Shawley, Grievance Coordinator; and Louis N. Folino, Superintendent. Walker filed suit against Michael A. Farnan, Chief Counsel; Jeffrey A. Beard, Secretary Pennsylvania DOC; David DiGuglielmo,

Their suits allege the officials violated their Fourteenth Amendment rights to due process by continuing to subject them to the deprivations of solitary confinement on death row without meaningful review of their placements after their death sentences had been vacated.[8] Inasmuch as the claimed liberty interest turns on the conditions of Plaintiffs' confinement, we will first describe those conditions and the legal authority relied upon to impose it, and then address whether those conditions violate a constitutionally protected liberty interest.

## A. Confinement on Death Row

Plaintiffs were placed on death row after receiving their death sentences pursuant to 61 Pa. Cons. Stat. § 4303, which provides:

> [T]he secretary [of corrections] shall, until infliction of the death penalty . . . keep the inmate in solitary confinement. During the confinement, no person shall be allowed to have access to the inmate without an order of the sentencing court, except the following:
> (1) The staff of the department.

---

Superintendent; and Cindy G. Watson, Chief Grievance Officer.

[8] Plaintiffs also initially asserted substantive due process and Eighth Amendment claims against the DOC that they do not pursue on appeal.

7

> (2) The inmate's counsel of record or other attorney requested by the inmate.
> (3) A spiritual adviser selected by the inmate or the members of the immediate family of the inmate.[9]

Plaintiffs assert that this provision no longer applied to them once their death sentences were vacated. They further stress that they did not receive meaningful review of their continuing placement on death row to determine if the deprivations of that placement were necessary.

In total, Walker spent approximately twenty years on death row. Roughly eight of those years were spent after he had been granted a resentencing hearing.[10] Williams spent twenty-two years on death row, with six of those years following his grant of resentencing.[11]

1. Walker

After his death sentence was vacated, Walker remained on death row where he was confined in a windowless seven by twelve feet cell for almost twenty-four hours a day. There, like other death row inmates at SCI-Graterford, he lost "virtually all communication [with] the

---

[9] 61 Pa. Stat. and Cons. Stat. § 4303, *formerly codified at* § 3003.

[10] *Walker v. Farnan*, No. CIV. A. 07-4977, 2015 WL 390424, at *1-2 (E.D. Pa. Jan. 29, 2015).

[11] Plaintiffs Br. at 4-6.

general population and the outside world."[12]  Walker was permitted four (non-legal) visits per month.  During those visits he was "locked in a closet-sized room, behind a reinforced sheet of glass . . . . [and was] not permitted physical contact with any of his visitors . . . ."[13]  Even Walker's meals were provided in the isolation of his cell.

Walker was permitted to leave his cell only five times a week for two-hour intervals of exercise in the open air, in a restricted area known as the "dog cage."[14]  However, to enter the "dog cage," Walker first had to undergo an invasive strip search.[15]  To avoid the psychological and physical intrusion of these "full" body searches, Walker did not leave his cell for open air exercise for nearly seven years.[16]

Walker alleges that his prolonged confinement on death row in these constricting conditions has taken a toll on his mental and physical well-being.  He describes these

---

[12] JA at 193 ¶36.

[13] *Id.* at 195 ¶60.

[14] *Id.* at 193-94 ¶47.

[15] The precise nature of the strip searches Walker was subjected to is not evident in the record.  Correctional facility strip searches have been described elsewhere as requiring an inmate to "lift and shake his genitalia, . . . bend over, spread his buttocks in the direction of the officer so that he may look at [the inmate's] anus, then made to squat and cough, and afterwards [the inmate is] hand cuffed behind his back[.]" *Incumaa v. Stirling*, 791 F.3d 517, 522 (4th Cir. 2015), *as amended* (July 7, 2015).

[16] JA at 193-94, 283 ¶6.

9

effects as "long term and debilitating."[17]  For example, due to the constant noise of other inmates on death row, and a "fear of being executed accidentally," Walker developed insomnia.[18]  He also claims to suffer from uncontrollable body tremors and severe emotional distress.

2. Williams

Williams's plight on death row at SCI-Greene was similar to Walker's.  He remained confined to his cell for almost twenty-two hours a day after his death sentence was vacated.  His meals were also provided in the confines of his cell.  Williams explains that because medical consultations were provided at his cell door, inmates in separate cells could hear his exchanges with medical providers, which compromised his privacy.  During the short intervals that Williams was not in his cell, but in the prison yard, law library, or shower, he was held inside a small locked cage that continued to restrict his movement and freedom of association.  Like Walker, he was only permitted non-contact visits.

**B. Plaintiffs' Legal Proceedings**

Plaintiffs filed numerous prison grievances based on continually being subjected to these deprivations.  Those grievances were unsuccessful.  Plaintiffs then filed the suits that are before us in these consolidated appeals.  The procedural background leading to these suits is as follows.

---

[17] *Id.* at 195-96 ¶64.

[18] *Id.* at 194 ¶51.

10

1. Williams

In 1988, Williams was convicted of first degree murder in the Philadelphia Court of Common Pleas and was later sentenced to death. Williams's criminal judgment was affirmed on direct appeal.[19] Williams then pursued relief under Pennsylvania's Post Conviction Relief Act ("PCRA").[20] On July 11, 2006, the trial court concluded that Williams was entitled to a new penalty hearing. Williams appealed the court's denial of his guilt phase claims, but the State did not appeal the court's invalidation of the death sentence that was imposed at the sentencing phase. On May 1, 2012, Williams was resentenced to life imprisonment without the possibility of parole. Soon thereafter, he was finally removed from death row at SCI-Greene and placed in the general population.[21]

In July of 2012, Williams filed a *pro se* and *in forma pauperis* action under 42 U.S.C. § 1983 against various DOC officials. He alleged that his confinement on death row between the time that he was granted resentencing and the time his new sentence was imposed violated his substantive and procedural due process rights. Defendants moved for summary judgment, contending that Williams's confinement while awaiting resentencing did not violate his constitutional

---

[19] *Commonwealth v. Williams*, 615 A.2d 716 (Pa. 1992).

[20] 42 Pa. Cons. Stat. § 9541 *et seq.*

[21] Williams did not challenge the delay between his resentencing, which took place in May, and his transfer into the general population, which took place in September.

11

rights. Defendants also argued that they were entitled to qualified immunity, a defense they had raised earlier in their answer to Williams's complaint. In a Report and Recommendation, the assigned Magistrate Judge concluded that Williams's Fourteenth Amendment procedural due process claim failed because he did not have a liberty interest in being housed in the general prison population.[22] The Magistrate Judge also concluded that because Defendants' policy of keeping inmates like Williams on death row even after their death sentences were vacated was grounded in legitimate penological goals, Williams did not have a substantive due process claim. [23] Overruling Williams's objections, the district court adopted the Report and Recommendation and granted Defendants' motion for summary judgment.[24] Williams appealed.

2. Walker

Walker was also convicted of first degree murder in the Philadelphia Court of Common Pleas in 1992, and sentenced to death. The verdict and sentence were affirmed by the Pennsylvania Supreme Court on direct appeal.[25] Walker thereafter filed for relief under the PCRA. In April 2004, the Philadelphia Court of Common Pleas upheld his conviction but granted a new sentencing hearing. After

---

[22] *Williams v. Wetzel*, No. CIV. A. 12-944, 2014 WL 252020, at *5 (W.D. Pa. Jan. 22, 2014). The district court adopted a magistrate judge's Report and Recommendation.
[23] *Id.* at *7-9.
[24] *Id.* at *1.
[25] *Commonwealth v. Walker*, 656 A.2d 90 (Pa. 1995).

additional unsuccessful challenges to his conviction, Walker was resentenced to life imprisonment without the possibility of parole on April 12, 2012,[26] and transferred to the general population on May 4, 2012.[27]

Before his resentencing, in 2008 Walker filed a *pro se* and *in forma pauperis* § 1983 action alleging that his confinement on death row after his death sentence had been vacated violated his Eighth Amendment right to be free from cruel and unusual punishment as well as his Fourteenth Amendment right to due process of law.[28] *Pro bono* counsel was appointed to represent Walker. The district court granted summary judgment in favor of Defendants.[29] The court concluded that Defendants were entitled to qualified immunity because the rights Walker asserted were not clearly established.[30] Walker's appeal from that ruling was consolidated with Williams's appeal.

## C. DOC Policy

Defendants argue that the DOC policy that implements § 4303 required Plaintiffs' *continued* confinement on death row until they were resentenced to life imprisonment. In relevant part, this policy states:

S. Modification of Sentence

---

[26] JA at 218.
[27] *Id.* at 287.
[28] Walker initially filed suit *pro se* and *in forma pauperis*. The district court appointed *pro bono* counsel to represent him.
[29] *Walker*, No. CIV. A. 07-4977, 2015 WL 390424, at *1.
[30] *Id.* at *4.

1. In the event that an order is received modifying the sentence of a Capital Case inmate to life imprisonment due to a re-sentencing proceeding held as the result of an appeal or Post Conviction Relief Act, . . . the facility Records Supervisor must determine whether the order is valid and whether the District Attorney intends to appeal the order.

2. If the District Attorney intends to appeal, the inmate shall not be moved from the Capital Case unit until the appeal is resolved. However, the inmate may be moved from the Capital Case Unit, if the District Attorney does not file an appeal within 30 days.

3. If the District Attorney does not intend to appeal and if the inmate does not remain subject to an execution sentence as the result of a prosecution other than the sentence modified in the order,

14

the inmate may be moved from
the Capital Case Unit.[31]

According to Defendants, this policy only permits removal from death row (referred to in the policy as the "Capital Case Unit") when a death sentence has actually been modified.  They claim that the grants of resentencing here merely put Plaintiffs' sentences on hold because re-imposition of the death penalty was possible.  In any event, Defendants assert they are protected from Plaintiffs' suits by qualified immunity.

## III. JURISDICTION AND STANDARD OF REVIEW

The district courts had jurisdiction under 28 U.S.C. § 1331.  We exercise jurisdiction over these consolidated appeals pursuant to 28 U.S.C. § 1291.  Our review of the courts' grants of summary judgment is plenary.[32]  Thus, we must draw all reasonable inferences in Plaintiffs' favor.[33]  If we find there are no genuine issues of material fact, and Defendants are entitled to judgment as a matter of law, we must affirm the courts' orders of summary judgment.[34]

## IV. DISCUSSION

---

[31] Pennsylvania Department of Corrections Capital Case Procedures Manual 6.5.8.1.S; JA at 91.

[32] *See Blackhawk v. Pennsylvania*, 381 F.3d 202, 206 (3d Cir. 2004).

[33] *See Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 218 (3d Cir. 2015).

[34] *See id.*

Plaintiffs maintain that their confinement on death row without regular placement reviews after they had been granted new sentencing hearings violated their procedural due process rights under the Fourteenth Amendment. Accordingly, we begin with the threshold question of whether Plaintiffs have asserted a liberty interest sufficient to trigger due process protections. If we conclude they have a liberty interest under the Due Process Clause, we then must decide if that right was clearly established when the alleged due process violation occurred. If the right was not clearly established, our inquiry ends and Defendants are entitled to qualified immunity. If it was, we then need to determine if there is a genuine issue of material fact regarding the alleged violation of that right.

**A. Qualified Immunity**

Defendants assert that qualified immunity bars Plaintiffs' claims for damages and that they are therefore not liable even if Plaintiffs' protracted confinement on death row was unconstitutional. Under the doctrine of qualified immunity, "officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights."[35] In assessing qualified immunity claims, we conduct a two-part inquiry. We first determine whether a right has been violated. If it has, we then must decide if the right at issue was clearly established when

---

[35] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

16

violated such that it would have been clear to a reasonable person that her conduct was unlawful.[36]

As the Supreme Court made clear in *Pearson v. Callahan*, courts are no longer required to tackle these steps in sequential order.[37] The decisions now on appeal represent both possible approaches. The district court that decided Williams's case found that his constitutional rights had not been violated, albeit not in the context of a qualified immunity analysis. The district court in Walker's case discussed only the second prong, concluding that because the right Walker alleged was not clearly established, Defendants were entitled to summary judgment based on qualified immunity.[38]

Despite relaxing the "rigid order of battle"[39] that formerly governed the analysis of qualified immunity, in *Pearson*, the Court nonetheless recognized that it is often appropriate and beneficial to define the scope of a

---

[36] *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009).
[37] *See Pearson*, 55 U.S. at 234-36 (relaxing "the rigid order of battle") (overruling *Saucier*, 533 U.S. 194); *see also Werkheiser v. Pocono Twp.*, 780 F.3d 172, 176 (3d Cir. 2015) ("Because we do not believe the right at issue here was clearly established, we begin with the second step.").
[38] *Walker*, No. CIV. A. 07-4977, 2015 WL 390424, at *4 ("Even if we were to somehow conclude that there was such a right, it certainly was not clearly established during the period in question.").
[39] *Pearson*, 555 U.S. at 234.

constitutional right.  Doing so "promotes the development of constitutional precedent" and is especially valuable "with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable."[40]  The analytical approach is thus left to appellate courts to resolve in the context of the individual case, and the constitutional question, before it.[41]

"Because we believe this case will clarify and elaborate upon our prior jurisprudence in important and necessary ways," we exercise our discretion under *Pearson* to reach the qualified immunity steps in sequence.[42]  Accordingly, we will first determine whether Plaintiffs' rights were violated and then decide if Defendants should have qualified immunity from suit.  We adopt this approach for several reasons, not the least of which is the salience of the underlying questions to the ongoing societal debate about solitary confinement.  But at a more basic level, lawsuits by prisoners, whether about conditions of confinement or other aspects of incarceration, are frequently—and, we stress, not inappropriately—met with qualified immunity defenses from defendants.[43]  Thus, defining rights when given the

---

[40] *Id.* at 236.

[41] *See id.*

[42] *Doe v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 169-70 (4th Cir. 2010).

[43] *See, e.g.*, *Gilmore v. Hodges*, 738 F.3d 266, 273 (11th Cir. 2013) ("A claim of deliberate indifference to a serious medical need in violation of the Eighth or Fourteenth Amendments necessarily arises only where the plaintiff is incarcerated, and a qualified immunity defense is generally

opportunity to do so not only inures to the benefit of potential plaintiffs, it also informs prison personnel and others about what is appropriate. Those responsible for discharging the difficult responsibility of administering our nation's prisons deserve clear statements about what the law allows.

**B. Protected Liberty Interest**
1. *Sandin*, *Wilkinson*, and *Shoats*[44]

---

available to the public official or officials against whom the plaintiff brings suit. . . . Thus, we see precious little reason to delay the resolution of the constitutional question until a later date, since any later case raising this question will almost surely be decided in the same context of qualified immunity.").

[44] Both Plaintiffs' and Defendants' appellate briefs focus on these and similar cases, and specifically the "atypical and significant hardship" standard from *Sandin* and its discussion of state-created liberty interests. However, our cases hold that prisoners whose sentences have been vacated, and who have not yet been resentenced, are treated as pretrial detainees for purposes of constitutional inquiry, even if their criminal conviction has not been reversed. *See Stevenson v. Carroll*, 495 F.3d 62, 67 (3d Cir. 2007). "Unlike sentenced prisoners, who . . . must look to state law for the protection of their personal liberties, pre-trial detainees have liberty interests firmly grounded in federal constitutional law." *Fuentes v. Wagner*, 206 F.3d 335, 341 (3d Cir. 2000) (quoting *Cobb v. Aytch*, 643 F.2d 946, 957 (3d Cir. 1981) (en banc)). In *Carroll*, as here, the "[institution did] not contest the status of the appellants as pretrial detainees . . . ." *Carroll* at 67.

A liberty interest may arise from the Constitution or "from an expectation or interest created by state laws."[45] Here, Plaintiffs contend they had a state-created liberty interest under the Fourteenth Amendment. To establish such an interest in the conditions of confinement context, courts generally require a showing that the alleged liberty interest is substantial.[46] To rise to the level of a liberty interest, the right

Moreover, we have emphasized that *Sandin*, which concerned the due process rights of a *sentenced* prisoner, does not apply in the pretrial-detainee context. *Fuentes*, 206 F.3d at 342 n.9; *see also Dilworth v. Adams*, 841 F.3d 246, 252 (4th Cir. 2016) ("Every federal court of appeals to consider the question has concluded that *Sandin*'s 'atypical and significant hardship' standard does not govern the procedural due process claims of pretrial detainees."); *Bistrian v. Levi*, 696 F.3d 352, 372-73 (3d Cir. 2012) (discussing the different due process standards).

We will nevertheless use the *Sandin* framework here, as both parties suggest. The standards applicable to sentenced inmates provide a floor for treatment of pretrial detainees, who are generally entitled to greater comparative freedom from unconstitutional punishments and deprivations of process. *See Bistrian*, 696 F.3d at 375. Moreover, since we find, as explained below, that Plaintiffs prevail in part even under the more demanding *Sandin* analysis, we would reach the same result even under the standard we set forth in the *Fuentes* and *Stevenson* line of cases.

[45] *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).

[46] We are not persuaded by Defendants' attempt to insert a second criterion, namely, that a "state-created" interest must

alleged must confer "freedom from restraint which . . . imposes *atypical and significant hardship* on the inmate in relation to the ordinary incidents of prison life."[47]

The Supreme Court's decisions in *Sandin v. Conner*[48] and *Wilkinson v. Austin*[49] guide our inquiry into what

---

be formalized through law or policy.  It is clear under *Sandin v. Conner* that we must consider the extent of the hardship, not whether the State has expressly written the right into law or policy.  515 U.S. 472, 481-82 (1995) ("[E]ncourag[ing] prisoners to comb regulations in search of mandatory language . . . creates disincentives for States to codify prison management procedures . . . [to] avoid creation of 'liberty' interests."); *see also Shoats v. Horn*, 213 F.3d 140, 143 (3d Cir. 2000) ("In [*Sandin*], the Supreme Court announced a new standard for determining whether prison conditions deprive a prisoner of a liberty interest that is protected by procedural due process guarantees."); *Parker v. Cook*, 642 F.2d 865, 867 (5th Cir. 1981) ("Since states rarely if ever explicitly label their creations as 'liberty interests,' we must look to the substance of the state action to determine whether a liberty interest has been created.  And whether this substance is embodied in a constitution, statute, regulation, rule, or practice is of no significance.").  Indeed, a contrary result would allow states to impose any level of extreme deprivations and escape remediation under the Due Process Clause by simply not writing the countervailing liberty interest into law or incorporating it into pronounced policy.
[47] *Griffin v. Vaughn*, 112 F.3d 703, 708 (3d Cir. 1997) (emphasis added) (quoting *Sandin*, 515 U.S. at 484).
[48] 515 U.S. 472 (1995).
[49] 545 U.S. 209 (2005).

constitutes an "atypical and significant" hardship. In 1995, the Court held in *Sandin* that no liberty interest was implicated by an inmate's placement in solitary confinement for thirty days as discipline for disruptive behavior.[50] The holding was based on the Court's conclusion that disciplinary solitary confinement was "within the expected perimeters of the sentence imposed" and therefore, was not atypical.[51] A decade later, in *Wilkinson*, the Court held that conditions at a "Supermax" facility were such a severely constricting environment that they gave rise to a state-created liberty interest.[52] The Court explained, "Supermax facilities are maximum-security prisons with highly restrictive conditions, designed to segregate the most dangerous prisoners from the general prison population."[53] The Court concluded that long-term incarceration in the Supermax at issue was "synonymous with extreme isolation."[54] Consequently, the Court held that the challenged conditions of confinement were atypical "under any plausible baseline."[55] The inmates therefore had a

---

[50] *Sandin*, 515 U.S. at 486 ("We hold that Conner's discipline in segregated confinement did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest.").

[51] *Id.* at 485.

[52] *Wilkinson*, 545 U.S. at 223-24.

[53] *Id.* at 213.

[54] *Id.* at 214.

[55] *Id.* at 223. In coming to this conclusion, the *Wilkinson* Court also considered the fact that placement in this Supermax facility disqualified an otherwise eligible inmate for parole consideration. *Id.* at 224. Contrary to Defendants' assertions, we need not consider the absence of this factor

liberty interest under the Fourteenth Amendment's Due Process Clause in not being subjected to these conditions absent procedural protections that ensured the confinement was appropriate.[56]

As *Wilkinson* recognized, "[i]n *Sandin*'s wake the Courts of Appeals have not reached consistent conclusions for identifying the baseline from which to measure what is atypical and significant."[57]  Given *Wilkinson*'s guidance, in *Shoats v. Horn* we established the following two-factor inquiry:  (1) the duration of the challenged conditions; and (2) whether the conditions overall imposed a significant hardship in relation to the ordinary incidents of prison life.[58]  Applying that inquiry in *Shoats*, we concluded that "virtual isolation for almost eight years" in solitary confinement created a protected liberty interest.[59]

---

here.  Parole was not Plaintiffs' to lose.  In any event, this consideration was not essential to the Court's finding of a protected interest in *Wilkinson*.  *See Westefer v. Snyder*, 422 F.3d 570, 590 (7th Cir. 2005) ("Illinois' contention that the liberty interest identified in *Wilkinson* turned exclusively on the absence of parole constitutes, [in] our view, far too crabbed a reading of the decision.").

[56] *Wilkinson*, 545 U.S. at 224.

[57] *Id.* at 223.

[58] 213 F.3d 140, 144 (3d Cir. 2000); *see also Powell v. Weiss*, 757 F.3d 338, 346 (3d Cir. 2014) (noting that *Shoats* is this court's governing standard).

[59] *Shoats*, 213 F.3d at 144.

*Shoats* involved a suit by an inmate confined in administrative custody because of his history of violence.[60] The inmate was serving a life sentence for murder when he escaped from custody.[61] During the escape, Shoats stabbed several guards.[62] Given his violent behavior and the perceived threat to others, Shoats was placed in administrative custody when finally recaptured. Under then existing prison policy, "there [was] no maximum period of confinement in administrative custody."[63] Rather, release back to the general population was dependent on "an evaluation of many factors."[64] These included behavior while in administrative custody, "continued risk, safety of others, and recommendations of prison personnel, including treatment staff."[65]

In discussing Shoats' claim that indefinite detention in administrative custody violated his right to due process, we described what administrative custody involved. Administrative custody meant that inmates were "not allowed to have radios, televisions, telephone calls (except emergency or legal), personal property except writing materials, or books other than legal materials and a personal religious volume."[66] "Non-legal visits [were limited to] one per week . . . under appropriate security procedures designated by the [prison's]

---

[60] *Id.* at 142-43.

[61] *Id.* at 141.

[62] *Id.*

[63] *Id.* at 142.

[64] *Id.*

[65] *Id.*

[66] *Id.*

24

Program Review Committee (PRC)."[67] Finally, inmates in administrative custody were not eligible to participate in any educational programs "and all meals [had to be] eaten in the inmates' cells."[68] We concluded that these deprivations were such a significant departure from the hardships normally attendant to incarceration that Shoats had a liberty interest in not being made to endure them indefinitely.[69]

2. Plaintiffs' Atypical Hardship
a. Duration of Segregation
Plaintiffs have shown atypical hardship. In *Sandin*, the Court found that thirty days in solitary confinement did not give rise to a protected interest.[70] In *Wilkinson*, the Court found that essentially indefinite confinement with the extreme deprivations imposed there did give rise to a protected interest.[71] The hardship Plaintiffs experienced here is far more analogous to the extreme deprivation in *Wilkinson* than the much shorter and less severe infringement on liberty that was present in *Sandin*. Both Plaintiffs remained in solitary confinement on death row for years—many multiples of *Sandin*'s thirty days—after the initial justification for subjecting them to such extreme deprivation (their death sentences) ceased to exist.[72] Plaintiffs' isolation on death row

---

[67] *Id.*

[68] *Id.*

[69] *Id.* at 144.

[70] *Sandin*, 515 U.S. at 486-87.

[71] *Wilkinson*, 545 U.S. at 224.

[72] Defendants' argument that Plaintiffs are responsible for the length of these periods of confinement because they initiated prolonged appeals of their convictions is both meritless and

lasted six and eight years. We see no meaningful distinction between those periods of extreme deprivation and the eight years of solitary confinement that we concluded in *Shoats* was "not only atypical, but [] indeed 'unique.'"[73] Although we do not suggest that it would be considered atypical under *Sandin*, we do note that researchers have found that even *a few days* in solitary confinement can cause cognitive disturbances.[74]

Here, as in *Wilkinson* and *Shoats*, Plaintiffs' placements on death row were indefinite.[75] In *Wilkinson*, "placement at [the Supermax] is for an indefinite period of time, limited only by an inmate's sentence. For an inmate serving a life sentence, there is no indication how long he

---

disappointing. Plaintiffs' exercise of their rights to appellate review is simply irrelevant to our assessment of the constitutionality of their conditions of confinement.

[73] *Shoats*, 213 F.3d at 144 (noting also that the DOC "would be concerned about the psychological damage to an inmate after *only 90 days* of such confinement and would generally recommend transfer to the general population after 90 days as a consequence") (emphasis in original); *see also Wilkerson v. Goodwin*, 774 F.3d 845, 855 (5th Cir. 2014) ("[T]he duration in segregated confinement that courts have found does not give rise to a liberty interest ranges up to two and one-half years.").

[74] Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325, 331 (2006) [hereinafter Grassian].

[75] *See* JA at 192 ¶31 ("Walker's solitary confinement is *indefinite*.") (emphasis added).

may be incarcerated . . . once assigned there."[76]   And in *Shoats*, we found the deprivations were indefinite because there was no maximum period for the inmate's placement in solitary confinement.[77]   Likewise, Plaintiffs' continued confinement on death row after their death sentences were vacated continued for years with no ascertainable date for their release into the general population.   Plaintiffs could not even hope to be released based on prison PRC review because these pro forma assessments did not consider the necessity of their severe conditions of confinement.   Obviously, had Plaintiffs' respective appellate proceedings stretched far beyond six and eight years, so would their respective placements on death row.   Indeed, Defendants argue this is precisely what the DOC policy would have required.   In Defendants' view, so long as re-imposition of the death penalty was possible, the automatic deprivations of death row were mandatory.

This indefiniteness contrasts sharply with other common forms of solitary confinement, such as the punitive segregation that is discussed in *Sandin*.[78]   The duration of the deprivations that follow from that seclusion is often predetermined and fixed[79] unless the inmate's behavior is thought to require an additional period of segregation.[80]

---

[76] *Wilkinson*, 545 U.S. at 214-15.

[77] *Shoats*, 213 F.3d at 142, 144.

[78] *Sandin*, 515 U.S. at 475-76, 485-86.

[79] *See, e.g.*, *id.* at 475-76 (noting that prior to the inmate's placement in solitary confinement, he was sentenced to a term of thirty days of administrative segregation).

[80] *See* JA at 251, 18:5-13.

27

Here, Walker and Williams could have been the most compliant inmates in a given facility, and exhibited no signs they would endanger themselves or others. They would still have been relegated to death row indefinitely even though they had won new sentencing proceedings and were not under active sentences of death. This would follow even if the professionals who are part of the prison PRC reviewed their placements and concluded that that level of confinement was not otherwise warranted. We therefore have no trouble holding that the conditions they had to endure while awaiting resentencing constitute an "*atypical . . . hardship* on the inmate in relation to the ordinary incidents of prison life."[81]

b. Plaintiffs' Significant Hardship

As in *Shoats*, it is undisputed that the conditions Plaintiffs experienced on death row "differ significantly from 'routine' prison conditions in Pennsylvania state institutions."[82] Among the range of hardships we have already noted, Plaintiffs were confined to their respective cells for twenty-two to twenty-four hours a day and ate all meals accompanied only by the emptiness within the walls of their cells. In addition, Williams was placed inside a small locked cage during much of the limited time he was allowed to leave his cell and Walker was subjected to invasive strip searches each time he left his cell for exercise. As discussed below, a body of research has shown that such conditions can

---

[81] *Griffin*, 112 F.3d at 708 (emphasis added) (quoting *Sandin*, 515 U.S. at 484).
[82] *Shoats*, 213 F.3d at 144.

28

trigger devastating psychological consequences, including a loss of a sense of self.[83]

These are also stark departures from conditions in the general prison population, and Defendants readily concede as much: "Regarding the comparison of conditions of confinement for capital case inmates with those [in the] general population, it is admitted that they are more strict than those for general population."[84] The record establishes that, unlike those confined on death row, inmates in the general population have: Access to open air activities without strip searches; regular access to windows and natural light; daily access to showers; and the right to more frequent visits where contact is permitted. General population inmates also have access to group religious services, while death row inmates are limited to religious tapes. A variety of jobs and vocational programs—including clothing factory jobs, culinary training, and barbershop training—are limited to inmates in the general population. Likewise, group sport activities are reserved for the general population. General population inmates can make phone calls as frequently as their funds allow. On death row, outside of attorney calls, only three fifteen minute calls are allowed per week.

The district court that ruled on Walker's claim recognized these discrepancies. The court stated in no uncertain terms that "[t]he conditions of confinement [on death row] are much more restrictive than in the general

_____

[83] *See infra* notes 144-171.

[84] JA at 63 ¶13; *see also* JA at 176 ¶9.

population at Graterford."[85]  For instance, "Plaintiff's contact with individuals other than prison staff was extremely limited [on death row].  Plaintiff received each of his three meals per day in his cell.  By contrast, the general population at Graterford eats in communal dining rooms."[86]  Thus, while general population affords inmates regular human contact, inmates on death row such as Plaintiffs are deprived of such interaction.  Even the most basic activities of daily living, such as eating, are done in utter solitude.

Numerous studies on the impact of solitary confinement show that these conditions are extremely hazardous to well-being.  Accordingly, it is precisely this type of isolation that led the courts in *Shoats* and *Wilkinson* to conclude that the deprivations of solitary confinement implicate a protected liberty interest.  In *Shoats*, we gave great weight to the fact that the inmate was "confined in his cell for 23 hours a day, five days a week, and 24 hours a day, two days a week . . . . [and] eats meals by himself."[87] Similarly, in *Wilkinson* the Supreme Court grounded a liberty interest on its finding that "[i]nmates must remain in their cells, which measure 7 by 14 feet, for 23 hours per day" and "[a]ll meals are taken alone in the inmate's cell instead of in a common eating area."[88]  These conditions of extreme social isolation cannot be meaningfully distinguished from the deprivations suffered by Plaintiffs here.

---

[85] *Walker*, No. CIV. A. 07-4977, 2015 WL 390424, at *1.
[86] *Id.*
[87] *Shoats*, 213 F.3d at 144.
[88] *Wilkinson*, 545 U.S. at 214.

In fact, in some respects, Plaintiffs' conditions were more severe than those the Supreme Court found atypical and significant under "*any* plausible baseline."[89]  Walker's cell was even smaller than the cells in *Wilkinson*,[90] and the inmates in *Wilkinson* were not subject to invasive strip searches when they left their cells.  Accordingly, Plaintiffs have sufficiently alleged the significant and atypical conditions of confinement that give rise to a protected liberty interest.

### 3. Defendants' Alternate Standard

Defendants assert that the appropriate standard in this case is not the general prison population as in *Wilkinson* and *Shoats*.  Instead, they claim the metric we should use is the conditions imposed on "inmates serving similar sentences" or what Plaintiffs' convictions have "authorized the State to impose."[91]  Defendants thus claim the baseline of comparison here is death row itself[92] because Plaintiffs remain eligible for the death penalty.[93]  Therefore, Defendants argue that

---

[89] *Id.* at 223 (emphasis added).

[90] The size of Williams's death row cell is not apparent in the record.

[91] Defendants Br. at 26.

[92] Defendants also suggest the comparator is conditions in general (non-death row) solitary confinement.  This standard is untenable.  It assumes, with no factual basis, that if Plaintiffs had been removed from death row earlier, they would necessarily have been placed in general solitary confinement as opposed to the general prison population.

[93] *Id.* ("It is enough to say that, for these prisoners, confinement on death row is not a 'departure' from the baseline, it *is* the baseline.") (emphasis in original).  We note

31

Plaintiffs' continued confinement on death row can hardly be atypical.

This argument fails for at least two reasons. First, the standard Defendants propose is inconsistent with *Shoats*. There, we did not limit our focus to the conditions of solitary confinement, even though the DOC might think it appropriate to subject inmates evidencing violent tendencies such as Shoats' to that level of deprivation. Rather, we judged Shoats' conditions "in relation to the *ordinary* incidents of prison life" or relative to "'*routine*' prison conditions."[94] The terms "ordinary" and "routine" direct us to use a general metric (the general population), not one specific to a particular inmate. Second, though some courts have used the

---

that in some jurisdictions, though to our knowledge Pennsylvania is not among them, even inmates with *active* death sentences are not always confined on death row—some are housed in the general population. *See* Arthur Liman Pub. Interest Program & Ass'n of St. Corr. Admin., *Time-In-Cell: The ASCA-Liman 2014 National Survey of Administrative Segregation in Prison* (Aug. 2015), 52-53, https://www.law.yale.edu/system/files/area/center/liman/document/asca-liman_administrativesegregationreport.pdf [hereinafter Time-in-Cell]; Mark D. Cunningham & Mark P. Vigen, *Death Row Inmate Characteristics, Adjustment, and Confinement: A Critical Review of the Literature*, 20 Behav. Sci. & L. 191, 205 (2002); George Lombardi et al., *Mainstreaming Death-Sentenced Inmates: The Missouri Experience and its Legal Significance*, 61 Fed. Prob. 3, 5 (1997).

[94] *Shoats*, 213 F.3d at 144 (emphases added).

metric Defendants propose, it is unworkable in this context.[95] We cannot resolve Plaintiffs' claims by reference to "inmates serving similar sentences" because, during the period at issue, Plaintiffs were not serving any sentence whatsoever. Their sentences had been vacated and resentencing had been ordered.

Defendants' other metric—what the State is authorized to impose—is based on a similarly mistaken premise. As we just explained, it is inconsistent with the analysis in both *Wilkinson* and *Shoats*. It also assumes that what the State is "authorized" to impose is determinative of our constitutional inquiry. However, whether Defendants were complying with DOC policy is irrelevant to our liberty interest analysis. As Plaintiffs point out, in *Shoats*, the DOC was following its own policy in providing Shoats with regular reviews and hearings regarding his placement in solitary confinement, and in keeping him there.[96] But these policies were only relevant to our finding that Shoats' due process rights had not been

---

[95] *See, e.g.*, *Rezaq v. Nalley*, 677 F.3d 1001, 1014 (10th Cir. 2012) ("[I]t is appropriate to compare the nature of the challenged conditions to the type of nonpunitive confinement routinely imposed on inmates serving comparable sentences."); *Hatch v. District of Columbia*, 184 F.3d 846, 847 (D.C. Cir. 1999) (holding that "due process is required when segregative confinement imposes an 'atypical and significant hardship' on an inmate in relation to the most restrictive conditions that prison officials . . . routinely impose on inmates serving similar sentences").

[96] *Shoats*, 213 F.3d at 142-43, 144-46.

violated.[97]   The DOC's compliance with its policy did not stand in the way of us finding that Shoats had a liberty interest in avoiding solitary confinement.  We answered the liberty interest question based on the conditions themselves, as we must if the Constitution is to be our guide.[98]

*Wilkinson* likewise instructs that application of the DOC policy must be circumscribed by Plaintiffs' liberty interest.  In *Wilkinson*, the Court explained that "it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement *is not the language of regulations* regarding those conditions but the nature of those conditions themselves."[99]  Therefore, Defendants' reliance on their own policy cannot defeat Plaintiffs' liberty interest.  Rather, our inquiry must be governed by the *conditions* on death row.

*Wilkinson* also counsels against weighing inmate dangerousness in determining whether Defendants' continued confinement of Plaintiffs on death row without meaningful review violated their liberty interests.  Defendants highlight the testimony of prison officials to claim that:

---

[97] *Id.*

[98] *Id.* at 144.

[99] *Wilkinson*, 545 U.S. at 223 (emphasis added); *see also Parker v. Cook*, 642 F.2d 865, 867 (5th Cir. 1981) ("[W]e must look to the substance of the state action to determine whether a liberty interest has been created.  And whether this substance is embodied in a constitution, statute, regulation, rule, or practice is of no significance.").

prisoners whose death sentences have been vacated, but who are still liable to have the death penalty re-imposed, present the same security and safety issues as those who are actually under a death sentence . . . . Thus, when a sentence of death is vacated on appeal or otherwise, the prisoner remains in a CCU until he or she is no longer exposed to the death penalty.[100]

In *Wilkinson*, the Court explained: "[H]arsh conditions may well be necessary and appropriate in light of the danger that high-risk inmates pose both to prison officials and to other prisoners. . . . That necessity, however, does not diminish our conclusion that the conditions give rise to a liberty interest in their avoidance."[101] Thus, although dangerousness is certainly relevant to Defendants' decisions about where to place inmates, it does not control the outcome of our due process analysis. It is the conditions themselves that determine whether a liberty interest is implicated and

---

[100] Defendants Br. at 6. The district court came to a similar conclusion in its substantive due process analysis. It found the policy had a valid purpose because "[t]here is no doubt that an inmate in such a situation presents a heightened risk and threat to the safety and security of staff and other inmates . . . . they have 'nothing left to lose.'" *Wetzel*, No. CIV. A. 12-944, 2014 WL 252020, at *8.

[101] *Wilkinson*, 545 U.S. at 224.

procedural protections must be in place to determine if the level of dangerousness justifies the deprivations imposed.

4. The Scientific Consensus

The robust body of scientific research on the effects of solitary confinement, combined with the Supreme Court's analysis in *Wilkinson* and ours in *Shoats*, further informs our inquiry into Plaintiffs' claim that they had a liberty interest in avoiding the extreme conditions of solitary confinement on death row. This research contextualizes and confirms the holdings in *Wilkinson* and *Shoats*: It is now clear that the deprivations of protracted solitary confinement so exceed the typical deprivations of imprisonment as to be the kind of "atypical, significant deprivation . . . which [can] create a liberty interest."[102]

A comprehensive meta-analysis of the existing literature on solitary confinement within and beyond the criminal justice setting found that "[t]he empirical record compels an unmistakable conclusion: this experience is psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at risk of long-term . . . damage."[103] Specifically, based on an examination of a representative sample of sensory deprivation studies, the researchers found that virtually *everyone* exposed

---

[102] *Sandin*, 515 U.S. at 486.

[103] Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. Rev. L. & Soc. Change 477, 500 (1997) [hereinafter Haney].

to such conditions is affected in some way.[104]  They further explained that "[t]here is not a single study of solitary confinement wherein non-voluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects."[105]   And as another researcher elaborated, "all [individuals subjected to solitary confinement] will . . . experience a degree of stupor, difficulties with thinking and concentration, obsessional thinking, agitation, irritability, and difficulty tolerating external stimuli."[106]

Anxiety and panic are common side effects.[107] Depression, post-traumatic stress disorder, psychosis, hallucinations, paranoia, claustrophobia, and suicidal ideation are also frequent results.[108]  Additional studies included in the aforementioned meta-analysis further "underscored the importance of social contact for the creation and maintenance of 'self.'"[109]  In other words, in the absence of interaction with others, an individual's very identity is at risk of disintegration.

In light of the severity of solitary confinement conditions, these troubling findings are hardly counterintuitive.  In one of the most comprehensive surveys of conditions of solitary confinement to date, researchers

---

[104] *Id.* at 500-03.

[105] *Id.* at 531.

[106] Grassian at 332.

[107] *See Haney* at 500-01.

[108] *See id.* at 521, 524, 530-31, 491 n.74.

[109] *Id.* at 503.

gathered detailed data from prison directors.[110]  They found that solitary confinement cells typically range from 45 to 128 square feet[111] or, in Justice Kennedy's words, "no larger than a typical parking spot."[112]  The researchers also learned that in many jurisdictions, inmates spend twenty-three hours a day on weekdays, and forty-eight hours straight on weekends, in these miniscule spaces.[113]  Opportunities to stay connected with family and friends are also limited, with some jurisdictions only permitting video visits and forbidding visits by minors.[114]

The results of all of these studies are really neither surprising, nor novel.  Over one hundred years ago, well before the full emergence of the empirical research in this area, the Supreme Court recognized that solitary confinement caused "[a] considerable number of the prisoners [to] f[a]ll, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane."[115]

Now, with the abundance of medical and psychological literature, the "dehumanizing effect"[116] of

---

[110] *Time-In-Cell*.

[111] *Id.* at ii.

[112] *Davis v. Ayala*, 135 S. Ct. 2187, 2208 (2015) (Kennedy, J., concurring).

[113] *Time-in-Cell* at ii.

[114] *Id.* at 45.

[115] *In re Medley*, 134 U.S. 160, 168 (1890).

[116] *Glossip v. Gross*, 135 S. Ct. 2726, 2765 (2015) (Breyer, J., dissenting).

solitary confinement is firmly established. As Justice Breyer recognized, "it is well documented that such prolonged solitary confinement produces numerous deleterious harms."[117] A clinical review by an expert who has evaluated the psychiatric effects of solitary confinement in over two hundred inmates offers a case in point.[118] This expert found that "disturbances were often observed in individuals who had no prior history of any mental illness."[119] That is to say, the evidence shows that the psychological trauma associated with solitary confinement is caused by the confinement itself. The relationship cannot be dismissed as merely a simple correlation between pre-existing mental health issues and placement in solitary confinement.

This study also determined that even a short time in solitary confinement is associated with drastic cognitive changes: "Indeed, even a few days of solitary confinement will predictably shift the electroencephalogram (EEG) pattern toward an abnormal pattern characteristic of stupor and delirium."[120] In the words of the study's author, solitary confinement is "strikingly toxic to mental functioning."[121]

As if psychological damage was not enough, the impact of the deprivation does not always stop there. Physical harm can also result. Studies have documented high

---

[117] *Id.*

[118] *Grassian* at 333.

[119] *Id.* at 328-29.

[120] *Id.* at 331.

[121] *Id.* at 354.

rates of suicide[122] and self-mutilation[123] amongst inmates who have been subjected to solitary confinement. These behaviors are believed to be maladaptive mechanisms for dealing with the psychological suffering that comes from isolation.[124] In addition, the lack of opportunity for free movement is associated with more general physical deterioration. The constellations of symptoms include dangerous weight loss, hypertension, and heart abnormalities, as well as the aggravation of pre-existing medical problems.[125]

Personal accounts of individuals subjected to solitary confinement are consistent with this body of research and

---

[122] *See, e.g.*, Thomas B. Benjamin & Kenneth Lux, *Constitutional and Psychological Implications of the Use of Solitary Confinement: Experience at the Maine State Prison*, 9 Clearinghouse Rev. 83, 84 (1975); Lindsay M. Hayes & Joseph R. Rowan, *National Study of Jail Suicides: Seven Years Later*, 32-33 (1988), http://www.ncianet.org/wp-content/uploads/2015/05/National-Study-of-Jail-Suicides-Seven-Years-Later-1988.pdf (finding that isolation is one of the key correlates of jail suicides).

[123] *See, e.g.*, Hans Toch, *Mosaic of Despair: Human Breakdowns in Prison* 52-53 (Revised ed., 1992); Stuart Grassian, *Psychopathological Effects of Solitary Confinement*, 140 Am. J. Psychiatry 1450, 1453 (1983).

[124] *See* Frank J. Porporino, *Managing Violent Individuals in Correctional Settings*, 1 J. Interpersonal Violence 213, 219 (1986).

[125] *See Haney* at 531; Richard Korn, *The Effects of Confinement in the High Security Unit at Lexington*, 15 Soc. Just. 8, 16 (1988).

describe the devastating effects of extreme isolation and sensory deprivation. One individual who spent twenty-nine years in solitary confinement explained, "At times I felt an anguish that is hard to put into words. To live 24/7 in a box, year after year, without the possibility of parole, probation or the suspension of sentence is a terrible thing to endure."[126] The experience drives some individuals to contemplate suicide.[127]

The conclusion of another inmate paints a similar picture. He described solitary confinement as capable of "alter[ing] the ontological makeup of a stone."[128] Given the research that we have discussed, that statement cannot be

---

[126] Robert King, *Experience: I Spent 29 Years in Solitary Confinement*, GUARDIAN (Aug. 27, 2010), https://www.theguardian.com/lifeandstyle/2010/aug/28/29-years-solitary-confinement-robert-king; *see also* Five Omar Mualimm-ak, *Solitary Confinement's Invisible Scars*, Guardian (Oct. 30, 2013), https://www.theguardian.com/commentisfree/2013/oct/30/solitary-confinement-invisible-scars ("Everyone knows that prison is supposed to take away your freedom. But solitary doesn't just confine your body; it kills your soul . . . . Even now that I am out of prison, I suffer major psychological consequences from those years in isolation.").

[127] Reginald Dwayne Betts, *Only Once I Thought About Suicide*, 125 Yale L.J. F. 222, 228 (2016), http://www.yalelawjournal.org/forum/only-once-i-thought-about-suicide.

[128] Jack Henry Abbott, *In the Belly of the Beast: Letters from Prison* 45 (1981).

dismissed merely because it is hyperbole.  In fact, that inmate eventually committed suicide in prison.[129]  And as we have just shown, his is not the only story of solitary confinement followed by deterioration and self-harm.  These stories confirm what the scores of studies[130] that have examined this phenomenon tell us:  Continued solitary confinement, the experience Plaintiffs complain of here, poses a grave threat to well-being.

This data compels us to recognize the similarities between the plight of Plaintiffs, and those of Shoats and the inmates in *Wilkinson*.  All were indefinitely subject to isolating conditions that researchers agree cause deep and long-term psychic harm.  Such harm is the essence of the atypical and significant hardship inquiry required under *Sandin* and *Wilkinson*.

---

[129] *Prison Writer Jack H. Abbott Dies*, Wash. Post (Feb. 12, 2002),
https://www.washingtonpost.com/archive/local/2002/02/12/prison-writer-jack-h-abbott-dies/b12e2969-a2e7-4530-bc72-d78af089023f/.

[130] *See, e.g.*, Henrik S. Andersen et al., *A Longitudinal Study of Prisoners on Remand Repeated Measures of Psychopathology in the Initial Phase of Solitary versus Nonsolitary Confinement*, 26 Int'l J.L. & Psychiatry 165, 173-75 (2003); Terry A. Kupers, *What to Do with the Survivors? Coping with the Long-Term Effects of Isolated Confinement*, 35 Crim. Just. & Behav. 1005, 1010 (2008); David Lovell, *Patterns of Disturbed Behavior in a Supermax Population*, 35 Crim. Just. & Behav. 985, 997 (2008).

5. Purportedly Contrary Precedent Cited by Defendants

      With one exception, which we shall discuss, the cases Defendants rely upon in arguing against Plaintiffs' liberty interest are readily distinguishable. Those cases hold that inmates confined under a death sentence do not have a liberty interest that precludes confinement on death row without regular review.[131] However, those inmates were all confined pursuant to death sentences *that had not been vacated*. Accordingly, confinement on death row was not a significant or atypical hardship for them. Rather, it was expressly within the "expected perimeters of the sentence imposed."[132] This logic does not apply here. Plaintiffs were no longer being confined under a death sentence because their death sentences had been vacated. Their liberty interests are thus not

---

[131] *Prieto v. Clarke*, 780 F.3d 245, 252 (4th Cir. 2015) ("[A] court cannot conclude that death row inmates have a state-created interest in consideration for non-solitary confinement when the State's established written policy expressly precludes such consideration."); *Smith v. Coughlin*, 748 F.2d 783, 787 (2d Cir. 1984) ("[I]n light of [state law], which expressly mandated his confinement [on death row], appellant had no basis to claim to be the beneficiary of any state-created liberty interest."); *Parker v. Cook*, 642 F.2d 865, 874 n.7 (5th Cir. 1981) ("Because death row inmates are never placed in the general population or given an expectation of being placed in the general population, it appears that no liberty interest is affected when they are placed in administrative segregation.").

[132] *Sandin*, 515 U.S. at 485.

comparable to those of inmates with active death sentences that arguably require continued placement on death row.

Defendants and the district court also relied on *Clark v. Beard*.[133]    There, the Commonwealth Court of Pennsylvania examined the same policy that is at issue here under circumstances that were similar to those before us. *Clark* did involve inmates confined on death row *without* active death sentences.[134]  However, that court's analysis does not advance our inquiry.  That court merely found the inmates failed to provide the facts necessary to establish an appropriate comparator for their conditions of confinement: "Their complaint describes the conditions in the Capital Case Unit, but it is devoid of any baseline against which to measure those conditions and determine whether they pose an 'atypical and significant hardship.'"[135]  As a result, the court concluded it could not determine if the inmates' conditions gave rise to a liberty interest under *Sandin*.  *Clark*'s holding thus rested on an evidentiary determination, not a constitutional one rooted in the Due Process Clause.  *Clark* did not decide if the inmates had a liberty interest in being housed outside death row.[136]  Consequently, *Clark* simply does not answer the question posed here.

---

[133] 918 A.2d 155 (Pa. Comm. Ct. 2007).

[134] *Id.* at 159.

[135] *Id.* at 162-63.

[136] *Id.*  As the district court noted here, "Defendants cited *Clark* as a basis for dismissal in their motion to dismiss.  We were not persuaded, however, observing that the Commonwealth Court's affirmance in *Clark* was based on the plaintiffs' failure to appropriately plead a cause of action-not

For the reasons we have discussed, we now hold that Plaintiffs had a due process liberty interest in avoiding the extreme sensory deprivation and isolation endemic in confinement on death row after their death sentences had been vacated.[137] However, as we explain below, we must nevertheless affirm the district courts' grants of summary judgment in favor of Defendants because we conclude that they are entitled to qualified immunity.

## C. Was the Right Clearly Established?

Having found a violation of Plaintiffs' constitutional rights, we now determine whether the scope of the right was clearly established for the purposes of Defendants' defense of qualified immunity.

As the district court suggested, a qualified immunity analysis looks through the rearview mirror, not the

---

necessarily on the absence of a constitutional right to be housed in the general population after their death sentences were vacated." *Walker*, No. CIV. A. 07-4977, 2015 WL 390424, at *4.

[137] As noted at the outset, only the district court that heard Williams's case reached the due process question. The district court that decided Walker's claim ruled on qualified immunity alone. Nevertheless, our conclusion regarding the due process right to avoid restrictive conditions of confinement applies equally to Walker, who was subjected to the same conditions under the same circumstances.

45

windshield.[138]  The inquiry focuses on the state of the relevant law when the violation allegedly occurred.  For a right to have been "clearly established," "existing precedent must have placed the statutory or constitutional question beyond debate." [139]  However, the facts of the existing precedent need not perfectly match the circumstances of the dispute in which the question arises.  "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." [140]  Requiring that precedent and subsequent disputes rest on identical facts would license state actors to violate constitutional rights with impunity simply by varying some irrelevant aspect of constitutional violations.

Here, although the precedent that existed when Defendants continued Plaintiffs' confinement on death row should have suggested caution, it was not sufficient to inform Defendants that their conduct violated clearly established law.  In arguing to the contrary, Plaintiffs cite *Shoats* for the proposition that an inmate's due process right to avoid solitary confinement was clearly established.[141]  We agree that the interest in avoiding extreme seclusion in *Shoats* is analogous to Plaintiffs' liberty interest even though *Shoats* did not involve confinement on death row.  As we have already explained, the conditions of confinement in *Shoats*—indefiniteness and extreme seclusion—closely mirror those Plaintiffs suffered.  Thus, *Shoats* is consistent with, and does support, Plaintiffs' claim that they had a protected liberty

---

[138] *See Crawford-El v. Britton*, 523 U.S. 574, 590 (1998).

[139] *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

[140] *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

[141] *Shoats*, 213 F.3d 140.

interest. However, we are not prepared to conclude that *Shoats* was sufficient to *clearly establish* Plaintiffs' due process interest in avoiding confinement on death row.

*Shoats* was not the only relevant law in existence during Plaintiffs' confinement after their sentences had been vacated. Section 4303[142] and its implementing policy[143] setting forth the conditions for release from death row also bear on whether Plaintiffs' due process rights were clearly established. Plaintiffs do not contest the legality of the statute or policy themselves. Rather, Plaintiffs concede that despite *Shoats*, the policy gave Defendants reason to believe their actions were lawful: "Admittedly, whether Appellants' rights were 'clearly established' at the time of the violation is a difficult question. Prison officials were following a prison policy that required that Appellants remain on death row until they were resentenced."[144]

Defendants read the statute and policy as creating a rule that requires "prisoners like Williams and Walker, whose death sentences have been vacated but who are still exposed to the death penalty, [to] remain [on death row] until re-sentenced to something other than death."[145] Though Defendants do not parse the policy, their interpretation is not without support. The policy's first criterion for removal from death row is "that an order is received *modifying* the sentence

---

[142] 61 Pa. Cons. Stat. § 4303.
[143] Pennsylvania Department of Corrections Capital Case Procedures Manual 6.5.8.1.S; JA at 91.
[144] Plaintiffs Supp. Br. at 4.
[145] Defendants Br. at 13.

47

of a Capital Case inmate to life imprisonment due to a re-sentencing proceeding held as the result of an appeal or Post Conviction Relief Act, or as the result of a commutation."[146] At the time in question, Plaintiffs' sentences had not yet been modified to life without the possibility of parole. Their sentences had been vacated. Nor were their death sentences commuted. Because Plaintiffs do not satisfy the first condition for release from death row pursuant to the policy, we need not reach the second two criteria. We merely note that Defendants' continued confinement of Plaintiffs on death row resulted from a reasonable interpretation of the policy.

In recognizing the validity of Defendants' interpretation of the policy, we do not suggest that the profound liberty concerns raised by Plaintiffs' continued confinement on death row can be overcome by a carefully worded prison policy. State policy cannot undermine a constitutional interest. Rather, Defendants' policy is only relevant to our qualified immunity analysis because the case law in existence during Plaintiffs' continued confinement on death row did not adequately inform Defendants that the policy ran counter to Plaintiffs' protected liberty interests. Indeed, the limited precedent that existed on the topic suggested the contrary.

*Clark*, as well as the district court that decided Williams's claim, read the policy and underlying statute the same way Defendants did.[147] They concluded that these

---

[146] Pennsylvania Department of Corrections Capital Case Procedures Manual 6.5.8.1.S.1 (emphasis added); JA at 91.
[147] *Wetzel*, No. CIV. A. 12-944, 2014 WL 252020, at *3 ("[P]ursuant to the aforementioned DOC policy, the

mandates required inmates' continued confinement on death row despite the fact that their death sentences had been vacated. In *Clark*, the Commonwealth Court of Pennsylvania described the policy as establishing that "[a]n inmate successful in having his capital punishment *replaced by another sentence* is eligible to be discharged from custody [on death row]."[148] Although, as we have just noted, *Shoats* should have raised concerns and counseled caution, *Shoats* does not directly dispute *Clark* or Defendants' interpretation of the policy because Shoats was not on death row. Thus, the DOC death row policy was simply not at issue there. We therefore cannot say Defendants' actions here were "plainly incompetent" or a "knowing[] violat[ion of] the law."[149]

Accordingly, we will affirm the district courts' grants of summary judgment based on qualified immunity in favor of all Defendants and against both Plaintiffs. We realize that the court that decided Williams's case incorrectly concluded that Williams did not have a protected liberty interest and therefore did not reach the question of qualified immunity. However, "[w]e may affirm a judgment on any ground apparent from the record, even if the district court did not

---

undersigned agrees with Defendants' position as to why Plaintiff was confined [on death row] during the disputed period of time."); *Clark*, 918 A.2d at 161 ("The warrant is the trigger for moving an inmate to [death row], but it is not the key to his continued stay there.").

[148] *Clark*, 918 A.2d at 164 (emphasis added).

[149] *Acierno v. Cloutier*, 40 F.3d 597, 616 (3d Cir. 1994) (en banc) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

reach it."[150] Our qualified immunity analysis applies equally to Walker and Williams.[151]

## V. CONCLUSION:

**A. The Jurisprudential Shift**

Given the scientific consensus, it should come as no surprise that courts have recently started recognizing inmates' due process right to avoid solitary confinement as clearly established. The Court of Appeals for the Fifth Circuit's decision in *Wilkerson v. Goodwin* is illustrative.[152] There, the record showed that the inmate had been confined to his cell for approximately twenty-three hours a day for nearly forty

---

[150] *Kabakjian v. United States*, 267 F.3d 208, 213 (3d Cir. 2001).

[151] As stated earlier, Williams sued Defendants in their individual and official capacities. The district court did not have to distinguish between the two types of defendants and claims because it decided that there was no underlying constitutional violation. Because we affirm on the second prong of qualified immunity, we *do* need to reach the distinction, as official-capacity defendants cannot take advantage of the qualified immunity defense. *See Melo v. Hafer*, 912 F.2d 628, 636 (3d Cir. 1990). Thus, we will affirm in favor of the official-capacity Defendants on the alternative but well-worn ground that Williams's § 1983 claims for money damages against the official-capacity Defendants were barred by Eleventh Amendment immunity. *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 254 (3d Cir. 2010).

[152] 774 F.3d 845 (5th Cir. 2014).

years, and his rights to visitation, personal property, and exercise had been severely curtailed.[153] Recognizing the clear threat to liberty such conditions pose, the court denied the prison officials' assertion of qualified immunity: "Viewed collectively, there can be no doubt that these conditions are sufficiently severe to give rise to a liberty interest under *Sandin*. This is particularly true in light of the district court's finding that [the inmate's] solitary confinement at Wade is effectively indefinite."[154]

Speaking in nearly identical terms, the Court of Appeals for the Second Circuit held that "[w]hatever confusion *Sandin* may have left in its wake, defendants do not argue, nor could a credible argument be made, that it was not clearly established at the time of the alleged violations that . . . ten years of solitary confinement[] triggered due process protection."[155] The Courts of Appeals for the Fourth[156] and Sixth Circuits[157] have also recognized the constitutional

---

[153] *Id.* at 848-49.

[154] *Id.* at 856.

[155] *Hanrahan v. Doling*, 331 F.3d 93, 99 (2d Cir. 2003) (per curiam).

[156] *See Incumaa v. Stirling*, 791 F.3d 517, 531 (4th Cir. 2015), *as amended* (July 7, 2015) ("Appellant offered evidence demonstrating that conditions in [solitary confinement] are significantly worse than in the general population and that the severity, duration, and indefiniteness of his confinement implicate the concerns the Supreme Court identified in *Wilkinson*.").

[157] *See Harden-Bey v. Rutter*, 524 F.3d 789, 792 (6th Cir. 2008) (recognizing that the plaintiff, an inmate subjected to

implications of solitary confinement. In *Incumaa v. Stirling*, the Court of Appeals for the Fourth Circuit found that the "near-daily cavity and strip searches; the confinement to a small cell for all sleeping and waking hours, aside from ten hours of activity outside the cell per month; [and] the inability to socialize with other inmates" endemic to solitary confinement were sufficiently severe to establish a protected liberty interest.[158] In *Prieto v. Clarke*, one member of that court went even further in a vigorous dissent, critiquing limitations on the due process rights of all inmates housed in extreme solitary confinement, even those on death row with *active* death sentences.[159]

A recent decision by the United States District Court for the Middle District of Pennsylvania is a prime example of the judiciary's increasing recognition of the scientific evidence of the harms of solitary confinement.[160] In *Johnson*

solitary confinement, "has a point. Even after a proper conviction and sentence, an inmate still retains a 'liberty' interest, guarded by due process, with respect to state-imposed prison discipline that rises to the level of an 'atypical and significant hardship on the inmate'" (quoting *Sandin*, 515 U.S. at 484)).

[158] 791 F.3d at 531.

[159] *Prieto*, 780 F.3d at 255-56 (Wynn, J., dissenting) ("In my view, the majority opinion reads *Wilkinson* unnecessarily narrowly in signing off on Prieto's automatic, permanent, and unreviewable placement in the highly restrictive conditions of Virginia's death row.").

[160] We discuss this case merely to highlight its factual findings and strong reliance on scientific research, both of

*v. Wetzel*, the district court held that the damage of indefinite solitary confinement was so severe, certain, and irreparable that Johnson—an inmate who had been subjected to solitary confinement for decades—was entitled to a preliminary injunction requiring his transfer to the general population.[161] The district court ordered this "extraordinary remedy"[162] because Johnson, though not on death row, was subjected to conditions much like those Plaintiffs experienced here. Johnson's "entire existence [was] restricted, for at least twenty-three hours per day, to an area smaller than the average horse stall."[163] Like Plaintiffs, Johnson was left for lost in the solitude of his cell walls "*ad infinitum.*"[164] Johnson testified about the extensive harms these conditions have caused him, including depression, memory loss, and profound hopelessness.[165] A scientific expert who examined Johnson corroborated his symptoms, concluding that Johnson

---

which are highly relevant to the issue before us. We, of course, do not rely on this case as precedent, or take any position on the merits of the court's decision.

[161] No. 1:16-CV-863, 2016 WL 5118149, at *12 (M.D. Pa. Sept. 20, 2016). The district court grounded its preliminary injunction in the Eighth Amendment's prohibition against cruel and unusual punishment. *Id.* at *6. The district court's findings on the harms of solitary confinement are pertinent to our procedural due process analysis, which must consider the significance of the conditions of confinement.

[162] *Id.* at *5.

[163] *Id.* at *1.

[164] *Id.* at *11.

[165] *Id.* at *4.

has "deteriorated to the point of *social death* as a direct result of his continued isolation."[166]

The district court found robust support for Johnson's claim in academic literature. It noted that researchers have observed that "psychological stressors such as isolation can be as clinically distressing as physical torture."[167] It also emphasized that it is not the only district court to have recognized the obviousness of the harms of solitary confinement.[168] As another district court has explained, "that prolonged isolation from social and environmental stimulation increases the risk of developing mental illness does not strike this Court as rocket science."[169]

In our ruling today, we now explicitly add our jurisprudential voice to this growing chorus. In doing so, we rely, in part, upon the scientific consensus and the recent precedent involving non-death row solitary confinement. Those decisions advance our inquiry into the unique, yet analogous, scenario presented here.[170] Inmates in solitary confinement on death row without active death sentences face the perils of extreme isolation and are at risk of erroneous deprivation of their liberty. Accordingly, they have a clearly established due process right under the Fourteenth

---

[166] *Id.* at *8 (emphasis added).

[167] *Id.* at *9.

[168] *Id.*

[169] *McClary v. Kelly*, 4 F. Supp. 2d 195, 208 (W.D.N.Y. Apr. 30, 1998).

[170] As previously noted, pursuant to Pennsylvania law death row *is* solitary confinement. 61 Pa. Cons. Stat. § 4303.

Amendment to avoid unnecessary and unexamined solitary confinement on death row. The State must therefore afford these inmates procedural protections that ensure that continuing this level of deprivation is required for penological purposes, and is not reflexively imposed without individualized justification.

## B. Plaintiffs' Due Process Right to Avoid Death Row Solitary Confinement is Now Clearly Established

Our holding today that Plaintiffs had a protected liberty interest provides "fair and clear warning"[171] that, despite our ruling against Plaintiffs, qualified immunity will not bar such claims in the future. As we have explained, scientific research and the evolving jurisprudence has made the harms of solitary confinement clear: Mental well-being and one's sense of self are at risk.[172] We can think of few values more worthy of constitutional protection than these core facets of human dignity. Accordingly, we accept Plaintiffs' request that "[t]his Court . . . make clear what prison officials should have already known: those no longer

---

[171] *United States v. Lanier*, 520 U.S. 259, 271 (1997).

[172] *See* Stuart Grassian & Nancy Friedman, *Effects of Sensory Deprivation in Psychiatric Seclusion and Solitary Confinement*, 8 Int'l J.L. & Psychiatry 49, 53 (1986) ("The more recent literature on this subject has also nearly uniformly described or speculated that solitary confinement has serious psychopathological consequences.").

subject to the death penalty . . . have a due process right to be free from indefinite conditions of solitary confinement."[173]

## C. The Required Procedural Protections

It is important to emphasize that this right to procedural due process protections is neither abstract nor symbolic, but both meaningful and required. In *Shoats*, upon finding a protected liberty interest in avoiding solitary confinement, we described what we considered to be adequate procedural protections. There, we granted summary judgment to the prison official defendants only because the procedures provided were sufficient to protect Shoats from being improperly held in solitary confinement.[174] We noted that under the applicable DOC policy, "an inmate must receive written notice of the reason for his placement in administrative custody and he is entitled to receive a hearing before a PRC within six days of the initial transfer to administrative custody."[175] Most importantly for our purposes, "[e]very thirty days thereafter, inmates . . . have the opportunity to be personally interviewed by the PRC, which then determines whether the inmate should continue to be maintained in administrative custody."[176] That determination takes into account "a variety of factors including the safety of other inmates and staff [and] the continued public or institutional risk."[177] According to the DOC procedures as set

---

[173] Plaintiffs Supp. Br. 4.

[174] *Shoats*, 213 F.3d at 147.

[175] *Id.* at 142.

[176] *Id.*

[177] *Id.*

forth in the record before us in this case, the PRC's decision may be based on evidence such as "counselor's reports [and] Psychiatric/Psychological information."[178]   For Shoats, we found that the "record reflect[ed] that the procedures called for did in fact occur."[179]

We see no justification consistent with these Plaintiffs' constitutionally protected liberty interests for subjecting them to the deprivations of being housed on death row after their death sentences were vacated with any less procedural protections than we held were adequate in *Shoats*.[180]

---

[178] JA at 116 ¶7.

[179] *Shoats*, 213 F.3d at 145.

[180] We note, simply to stress the importance of individualized placement reviews, that comparative studies examining the incidence of prison violence have found equivalent rates between death-sentenced and non-death-sentenced inmates. *See, e.g.*, Mark D. Cunningham & Thomas J. Reidy, *Don't Confuse Me with the Facts:  Common Errors in Violence Risk Assessment at Capital Sentencing*, 26 Crim. Just. & Behav. 20, 23-24, 27 (1999); Jon Sorensen & Robert D. Wrinkle, *No Hope for Parole:  Disciplinary Infractions among Death-Sentenced and Life-Without-Parole Inmates*, 23 Crim. Just. & Behav. 542, 549-50 (1996).

As one analysis concluded, "An expectation then that death row inmates will invariably commit assaults in prison because they have 'nothing to lose' appears to be unfounded." Mark D. Cunningham & Mark P. Vigen, *Death Row Inmate Characteristics, Adjustment, and Confinement:  A Critical Review of the Literature*, 20 Behav. Sci. & L. 191, 203

The review that we found adequate in *Shoats* is not an inconvenient ritual intended to shelter officials from liability so that they may mechanically continue an inmate's confinement on death row after a sentence of death has been vacated without fear of sanction. Rather, such inmates have a right to *regular and meaningful* review of their continued placement on death row.[181] In conjunction with periodic review, to ensure the review is meaningful, this process must include a statement of reasons for the continued placement on death row.[182] Inmates must also have a meaningful opportunity to respond to the reasons provided.[183] These procedures would be of little value absent the attendant right

---

(2002). This conclusion may well apply here, where the vacatur of Plaintiffs' death sentences made *life* theirs to lose. This is precisely why an individualized assessment of the necessity of continued confinement of inmates like Plaintiffs on death row by the prison PRC is so necessary.

[181] *See Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1983) ("Of course, administrative segregation may not be used as a pretext for indefinite confinement of an inmate. Prison officials must engage in some sort of *periodic review* of the confinement of such inmates." (emphasis added)), *overruled on other grounds by Sandin*, 515 U.S. 472.

[182] *See Wilkinson*, 545 U.S. at 226 ("If the recommendation is [solitary] placement, Ohio requires that the decisionmaker provide a short statement of reasons. This requirement guards against arbitrary decisionmaking while also providing the inmate a basis for objection before the next decisionmaker or in a subsequent classification review."); s*ee also* JA at 97 ¶4.

[183] *See* JA at 99 ¶6.

of a hearing.[184]  Without such protections, the Constitution's guarantee of due process would be "a tale . . . full of sound and fury, signifying nothing."[185]  As Justice Kennedy has explained, this would leave individuals vulnerable to erroneous and unjustifiable infliction of "[y]ears on end of near-total isolation" at "a terrible price."[186]

## VI.

For the foregoing reasons, we will affirm the district courts' orders granting summary judgment in favor of Defendants based on qualified immunity.  We also hold that it is now clearly established that inmates on death row whose death sentences have been vacated have a due process right to avoid continued placement in solitary confinement on death row, absent the kind of meaningful protections discussed herein.

---

[184] *See Wolff v. McDonnell*, 418 U.S. 539, 557-58 (1974).

[185] William Shakespeare, *Macbeth*, act V, sc. V.

[186] *Davis v. Ayala*, 135 S. Ct. 2187, 2210 (2015) (Kennedy, J., concurring).