**E. Parl WELCH, Appellant,**

v.

**George P. SHULTZ, Secretary of the Treasury, et al.**

**No. 71-1208.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 22, 1972.

Decided July 26, 1973.

---

Glenn R. Graves, Washington, D. C., with whom John W. Karr, Washington, D. C., was on the brief, for appellant.

Richard S. Stolker, Atty., Dept. of Justice, with whom Robert L. Kevch and Lee B. Anderson, Attys., Dept of Justice, were on the brief, for appellee. George W. Calhoun, Atty., Dept. of Justice, also entered an appearance for appellee.

Before McCREE,* Circuit Judge for the Sixth Circuit, and ROBINSON and ROBB, Circuit Judges.

PER CURIAM:

In February, 1967, appellant applied to the Secretary of the Treasury for a license to send a check for $2,000 to the Canadian Friends Service Committee, a relief organization headquartered in Toronto. The organization was accepting contributions toward the purchase of medical supplies for civilian use in North and South Vietnam, and appellant, a Quaker citizen of the United States, stated in his application that his check was intended to serve that purpose. On March 10, 1967, appellant was notified that his request had been denied on the ground that the contribution contemplated was inconsistent with then —existing policy of the Office of Foreign Assets Control of the Department of the Treasury in its administration of the Trading With the Enemy Act[1] and regulations promulgated thereunder.[2]

Prior to appellant's application, the Office of Foreign Assets Control pursued the general practice of denying all applications for licenses to send money or commodities directly or indirectly to certain countries, including North Vietnam. In the fall of 1966, by virtue of an exception then made, ten applications were granted to the extent of authorizing a total of $10,200 to be sent to the Canadian Friends Service Committee and the International Committee of the Red Cross for the procurement of medical supplies for civilian relief in North Vietnam and Viet Cong-controlled areas. The exception followed advice from the Department of State that a program allowing contributions in limited amounts under controlled conditions would be desirable. It was hoped that an impartial relief team would be permitted to observe the distribution of the supplies, and that channels would open through which assistance could be provided to American prisoners of war. Action on subsequent applications was withheld, and the program was kept under constant review, to enable a determination as to whether sufficient progress was being made to warrant its continuance.

On February 27, 1967, however, a reversion to the general policy of total prohibition of such contributions was announced. The State Department had informed the Office of Foreign Assets Control that North Vietnam was unwilling to allow observers from relief agencies to witness distributions. Responses by license applicants to requests for information as to whether medical supplies sent to North Vietnam were actually confined to civilian use were uniformly to the effect that while the applicants hoped or believed that the supplies would serve only the intended recipients, there was no guaranty or evidence that they would. The Office of Foreign Assets Control then decided that all pending and subsequently-filed requests for licenses to send funds to relief agencies abroad for the purchase of medical supplies for shipment to North Vietnam would be denied because there was no assurance that the supplies would in fact be devoted to the nonmilitary purposes intended by the donors. And so it was that appellant's application was refused.

On December 1, 1967, appellant brought suit in the District Court for declaratory and injunctive relief from

* Sitting by designation pursuant to 28 U.S.C. § 291(a) (1970).

1. 40 Stat. 411 (1917), as amended, 50 U.S.C.App. § 1 et seq. (1970).

2. Foreign Assets Control Regulations, 31 C.F.R. pt. 500 (1972).

the refusal. He asserted that the Trading With the Enemy Act did not authorize the administrative regulations and policy which led to the denial of his application; and, alternatively that if the Act did, it contravened the First and Fifth Amendments. By supplemental complaint, appellant drew into the litigation another incident. In February, 1968, appellant sent a check for $25.00 to the Canadian Friends Service Committee which, by his allegations, was intended as a contribution toward the work of Quaker Vietnam medical aid. A month later, his bank notified him that the funds represented by the check were blocked and could not be paid without a license from the Treasury Department.[3]

In dealing with appellant's suit, the District Court first addressed his motion that a three-judge court be convened.[4] Deeming appellant's constitutional contentions insubstantial and holding that the issues over regulations and policy were properly to be determined by a single judge, the court denied the motion.[5] Subsequently, the court awarded a summary judgment against appellant on the ground that the action of which he complained was within the ambit of authority delegated by the Trading With the Enemy Act, and that the administrative ban on his contributions was constitutionally unobjectionable.[6]

On this appeal, from the latter determination, broad issues of constitutional power and statutory interpretation have been tendered for our consideration. We think it clear, however, that resolution of these issues may be unnecessary, and in any event on the record before us is unfeasible. After this appeal came under submission, there occurred a significant change of conditions which could exert a profound effect on this case. On January 27, 1973, the United States and other belligerents in Vietnam signed an agreement formally terminating hostilities and specifying a number of steps designed to restore and preserve peace.[7] That instrument solemnly declares that "[t]he United States anticipates that this Agreement will usher in an era of reconciliation with the Democratic Republic of Vietnam as with all peoples of Indochina," [8] and that "[i]n pursuance of its traditional policy, the United States will contribute to healing the wounds of war and to postwar reconstruction of the Democratic Republic of Vietnam and throughout Indochina." [9] It further declares that "[t]he ending of the war, the restoration of peace in Vietnam, and strict implementation of this Agreement will create conditions for establishing a new, equal and mutually beneficial relationship between the United States and the Democratic Republic of Vietnam," [10] and simultaneously "will ensure stable peace in Vietnam and contribute to the preservation of lasting peace in Indochina and Southeast Asia." [11] Since execution of this

3. The blocking resulted from a letter directing all domestic banking institutions not to pay or forward, without specific authorization from the Office of Foreign Assets Control, any negotiable instrument which was received from a named Canadian bank on a collection basis and which was payable to or indorsed by the Canadian Friends Service Committee or named individuals known to be involved in receiving funds on its behalf for medical aid in Vietnam. It was the practice of the Office of Foreign Assets Control to license payment of instruments as to which the drawer presented evidence that it was not intended as a contribution toward medical aid in Vietnam.

4. Pursuant to 28 U.S.C. § 2282 (1970).

5. Welch v. Kennedy, Civ. No. 3066–67 (D.D.C. Nov. 12, 1970) (unreported).

6. Welch v. Kennedy, 319 F.Supp. 945 (1970).

7. Agreement on Ending the War and Restoring Peace in Vietnam, January 27, 1973, T.I.A.S. No. ——, reproduced in 119 Cong.Rec. H 447 (daily ed. Jan. 24, 1973).

8. *Id.* ch VIII, art. 21.

9. *Id.*

10. *Id.* ch. VIII, art. 22.

11. *Id.*

agreement, all military forces and personnel of the United States have been withdrawn from Vietnam and for the United States the conflict there is at an end.[12]

We are not able to measure with any reasonable degree of precision the possible impact of this turn of events upon the quarrel in which the litigants became embroiled. The change in circumstances which has overtaken this appeal may well have seriously modified the controversy which the parties briefed and argued here, or even actually mooted it. In light of the pledges incorporated in the cease-fire agreement, it may be that the Office of Foreign Assets has modified its no-contributions policy, or plans to do so in the near future. By the same token, the basis for decision of any dispute which may have survived that agreement may, at the very least, have taken on an added dimension.

We think it inappropriate to undertake, in the present posture of the record, a settlement of the issues involved. Questions of constitutional magnitude—here, respecting administrative policy—are not to be decided unless strictly necessary,[13] and we cannot be sure that there is any longer a need to reach them at all. The same may be said for the important questions of statutory construction which the District Court was summoned to resolve,[14] which supervening events may have altered or even eliminated. And if indeed all difficulties between the litigants have been composed by those events, our authority to adjudicate them has ceased.[15]

In sum, an accurate assessment of the current status of the controversy requires exploration and reappraisal, and any residual problems call for definition and examination afresh on an up-to-date factual record.[16] The forum equipped for adversary treatment of these considerations is obviously the District Court, and to these ends, we remand the record. The parties are urged to seek reconciliation of any differences they may still have, and simplification of any judicial task that may remain. Should the District Court find any aspect of the litigation still alive, it will be free to make the decision it deems proper. We reserve our jurisdiction pending completion of the remand.

So ordered.

12. We note, however, the continuing military presence of the United States in Cambodia, and its current negotiations with North Vietnam on termination of the Cambodian conflict.

13. Thorpe v. Housing Authority, 393 U.S. 268, 284, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969) ; Petite v. United States, 361 U.S. 529, 531, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960) ; Harmon v. Brucker, 355 U.S. 579, 581–582, 78 S.Ct. 433, 2 L.Ed. 2d 503 (1958) ; Peters v. Hobby, 349 U.S. 331, 338, 75 S.Ct. 790, 99 L.Ed. 1129 (1955).

14. See Barr v. Matteo, 355 U.S. 171, 172, 78 S.Ct. 204, 2 L.Ed.2d 179 (1957) ; Eccles v. Peoples Bank, 333 U.S. 426, 432, 68 S.Ct. 641, 92 L.Ed. 784 (1948).

15. E. g., Powell v. McCormack, 395 U.S. 486, 496 n. 7, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) ; A. L. Mechling Barge Lines, Inc. v. United States, 368 U.S. 324, 328–331, 82 S.Ct. 337, 7 L.Ed.2d 317 (1961).

16. See United States v. Petrillo, 332 U.S. 1, 12, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947) ; Borden's Farm Prods. Co. v. Baldwin, 293 U.S. 194, 210–213, 55 S.Ct. 187, 79 L.Ed. 281 (1934) ; Chastleton Corp. v. Sinclair, 264 U.S. 543, 548–549, 44 S.Ct. 405, 68 L.Ed. 841 (1924).