# United States Court of Appeals
## For the First Circuit

No. 22-1716

JERRY CINTRON,

Plaintiff, Appellee,

v.

PAUL BIBEAULT, in his official and individual capacity; RUI
DINIZ, in his official and individual capacity; MATTHEW KETTLE,
in his official and individual capacity; PATRICIA ANNE COYNE-
FAGUE, in her individual capacity; WAYNE T. SALISBURY, JR.,
Director, in his official capacity; STEVEN CABRAL, Special
Investigator, in his official and individual capacity; JEFFREY
ACETO, in his official and individual capacity; LYNNE CORRY, in
her official and individual capacity,

Defendants, Appellants,

LT. HAYES, in his official and individual capacity; LT. MOE, in
his official and individual capacity; LT. BUSH, in his official
and individual capacity; JENNIFER CHAPMAN, in her official and
individual capacity; "COUNSELOR" FRANCO, in her official and
individual capacity,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

Before

Gelpí, Lipez, and Kayatta,
Circuit Judges.

Katherine Connolly Sadeck, Assistant Attorney General, for appellants.

George Mills, with whom Natalia Friedlander, Jennifer L. Wood, Rhode Island Center for Justice, Daniel M. Greenfield, Kathrina Szymborski Wolfkot, Felipe Hernandez, Benjamin Gunning, and Roderick & Solange MacArthur Justice Center were on brief, for appellee.

Marissa Lalli, Nina B. Garcia, Hannah E. Gelbort, and Wilmer Cutler Pickering Hale and Dorr LLP on brief for Terry Kupers, Craig Haney, Pablo Stewart, and Stuart Grassian, amici curiae.

R. Stanton Jones, Andrew T. Tutt, Rebecca A. Caruso, and Arnold & Porter Kaye Scholer LLP on brief for Professor John F. Stinneford, amicus curiae.

Daniel S. Ruzumna, Isaac Weingram, David Moosmann, Patterson Belknap Webb & Tyler LLP on brief for Rights Behind Bars, amicus curiae.

Sonja L. Deyoe and Lynette Labinger on brief for American Civil Liberties Union of Rhode Island, Aaron Regunberg, and Leonela Felix, amici curiae.

Jared A. Goldstein and Roger Williams University School of Law on brief for Incarcerated Persons Who Have Been Placed in Long-Term Solitary Confinement at Rhode Island's Adult Correctional Institutions, amici curiae.

Melissa Giangrande, Tiara Brown, and Hogan Lovells US LLP on brief for Former Corrections Officials Dan Pacholke, Dick Morgan, Eldon Vail, and Steve J. Martin, amici curiae.

John P. Bueker, Jessica Dormitzer, Emma Notis-McConarty, Jason P. Roskom, and Ropes & Gray LLP on brief for OpenDoors, amicus curiae.

Alexandra D. Valenti, Anne Bayly Buck, Robert Frederickson, III, William E. Evans, and Goodwin Procter LLP on brief for Dr. Andrew Kolodny, amicus curiae.

Nancy Gertner and Fick & Marx LLP on brief for Center for Law, Brain & Behavior, amicus curiae.

Andrew S. Wainwright, Thornton Law Firm, LLP, Martin J. Siegel, and Appellate Civil Rights Clinic, University of Houston Law Center on brief for Dr. Jennifer G. Clarke, amicus curiae.

---

August 5, 2025

---

**KAYATTA**, **Circuit Judge**.  In July 2019, Jerry Cintron overdosed on a fentanyl-laced pill while in Rhode Island Department of Corrections (RIDOC) custody.  For his alleged role in acquiring, possessing, and consuming the pill, RIDOC sanctioned Cintron with 450 days in solitary confinement.  While so confined, Cintron allegedly experienced severe mental and physical deterioration, stemming from the conditions of confinement that characterized his stint in solitary.

Relying on 42 U.S.C. § 1983, Cintron sued eight current and former RIDOC officials ("defendants"), accusing them of violating his Eighth Amendment "right to be free from cruel and unusual punishment by deliberately and recklessly placing him at substantial risk of serious harm."  He alleges, among other things, that defendants deliberately responded indifferently to his suffering by continuing his punitive solitary confinement even as his physical and mental deterioration went untreated.  Defendants moved for judgment on the pleadings, arguing, among other things, that Cintron's claim failed on its merits and that defendants were entitled to qualified immunity from his § 1983 claim for damages.  In a text order, the district court denied the motion in relevant part, prompting defendants to appeal.

For the reasons we explain below, we affirm in part, reverse in part, and vacate and remand in part.

- 3 -

## I.

Because this appeal concerns the adequacy of the pleadings, we assume the truth of Cintron's factual allegations, which we recite below.  See Abraham v. Woods Hole Oceanographic Inst., 553 F.3d 114, 115 (1st Cir. 2009).

## A.

In February 2016, Cintron began serving a ten-year sentence for possession of cocaine with intent to distribute, with a good-time release date of September 2025.  Cintron, who suffers from opioid use disorder, successfully avoided drugs throughout his first three-and-a-half years in RIDOC custody.  During that time, he sought enrollment in RIDOC's Medication Assisted Treatment (MAT) program, a medication and therapy program that RIDOC touts as "show[ing] great success" in "reduc[ing] opioid overdose deaths in the state."[1]  RIDOC refused to enroll him.

In July 2019, while incarcerated in a medium-security facility at RIDOC's Adult Correctional Institutions (ACI), Cintron relapsed.  He obtained and overdosed on half of a fentanyl-laced pill, which he had thought was Percocet, a prescription drug comprising a semisynthetic opioid (oxycodone) and acetaminophen.

---

[1]  Medication Assisted Treatment at the RI Department of Corrections, R.I. Dep't of Behav. Healthcare, Developmental Disabilities & Hosps. (Jan. 25, 2024), https://perma.cc/8R8A-3HRQ.

He was taken to a hospital, where he was revived with multiple doses of Narcan (a brand of the opioid antagonist naloxone).

Defendant RIDOC Investigator Paul Bibeault visited Cintron at the hospital to question him about the pill's origins. Bibeault and Cintron had some history -- Bibeault had served as a correctional officer in Cintron's old cell block and reportedly forced Cintron out of that block because Bibeault disliked Cintron. While Cintron admitted to consuming a half pill, his condition prevented him from otherwise answering Bibeault's questions.

The next day, the hospital discharged Cintron. He returned to the ACI, where Bibeault once more questioned him concerning the pill's origins. Bibeault threatened to send Cintron to ACI's high-security unit if he did not cooperate, and Cintron did in fact refuse to cooperate.

The following week, prison authorities issued Cintron a disciplinary booking for being under the influence of the unauthorized pill. He was adjudicated guilty two days later and received twenty-five days in solitary confinement as punishment.[2]

---

[2] The parties variably refer to Cintron spending time in "disciplinary segregation," "administrative segregation," and "restrictive housing." While the three phrases carry different technical meanings, we use the more well-known catch-all "solitary confinement" (or "solitary" for short) for clarity and consistency. See Natasha A. Frost & Carlos E. Monteiro, Administrative Segregation in U.S. Prisons, in Nat'l Inst. of Just., Dep't of Just., Restrictive Housing in the U.S. 1, 3-4 (Marie Garcia ed., 2016), https://perma.cc/TYJ6-JB8C (adopting a

A week later, Bibeault issued Cintron a second booking for the same incident, charging Cintron with possessing the intoxicant that he had consumed. Adjudicated guilty four days later, Cintron received another thirty days in solitary.

During Cintron's fifty-five days in solitary confinement, Bibeault interrogated him at least twice about the pill's origins. In one of those meetings, Bibeault called Cintron a "piece of shit" and threatened him with state criminal charges. In another meeting, Bibeault and Defendant RIDOC Investigator Steve Cabral threatened to put Cintron in solitary confinement for a year if he did not cooperate. When Cintron refused to divulge the pill's origins, Bibeault (in Cabral's presence) said, "We'll see if you're still normal when you get out of [solitary], kid. You're fucking buried alive. I'm going to bury you alive." Accusing Cintron of helping import the pill into the ACI, Bibeault told Cintron (in Cabral's presence) that he would book Cintron for trafficking because Cintron was "being a hard-ass."

Attempting to raise an alarm about Bibeault's threat, Cintron informed Defendant Rui Diniz, the medium-security warden, about his conversation with Bibeault and Cabral. Diniz responded that he did not care and that he would personally make sure that

_____

similar approach when discussing empirical research); see also Perry v. Spencer, 94 F.4th 136, 158-59 (1st Cir. 2024) (similar).

Cintron received 365 days in solitary confinement -- the maximum sanction for narcotics trafficking.

On August 8, after around three weeks in solitary, Cintron had a hearing before RIDOC's classification board. At the meeting, the board reclassified Cintron from medium security to high security, prompting a transfer to RIDOC's high-security unit. Shortly thereafter, Cintron wrote to Defendant Matthew Kettle, RIDOC's assistant director of institutions and operations, asking to remain in medium security. Cintron received a response two weeks later from Defendant RIDOC Director Patricia Anne Coyne-Fague,[3] who informed Cintron that she had delegated review of classification decisions to Kettle, who had approved Cintron's reclassification to high security.

That same day, August 22, Bibeault booked Cintron for trafficking the pill. RIDOC adjudicated Cintron guilty and sanctioned him with a year of solitary confinement. During that hearing, RIDOC also adjudicated Cintron guilty of circumventing phone security procedures in connection with his alleged trafficking, tacking on another thirty days of solitary. Thus, over the course of about one month, RIDOC cumulatively sanctioned

---

[3] Defendant Wayne T. Salisbury, Jr., took over RIDOC's directorship from Coyne-Fague in January 2023. Consequently, Cintron seeks relief against Salisbury only in his official capacity and against Coyne-Fague only in her individual capacity. He seeks recovery against the other six defendants in their official and individual capacities.

Cintron with 450 days in solitary as punishment for his alleged misconduct in connection with the pill. Kettle denied all of Cintron's disciplinary appeals.

B.

Prior to entering solitary confinement, Cintron lived a relatively normal prison life. He received ten hours of out-of-cell time each day, visited with and called family members, took advantage of educational and programming opportunities, participated in a "Daddy Daycare" program with his children, and did not take any mental health medication.

Solitary confinement changed all of that. Cintron lost access to virtually all interpersonal interaction. Prison authorities confined him to his cell nearly constantly -- at most, he could spend five hours outside his cell per week. He received a maximum of one ten-minute phone call each month and could not see his family members in person. "All meals [we]re taken alone in [his] cell instead of in a common eating area." Wilkinson v. Austin, 545 U.S. 209, 214 (2005). In short, these conditions deprived Cintron "of almost all human contact." Id.

In addition to curtailing Cintron's ability to interact with others, RIDOC denied him access to radio, television, an MP3 player, a desk, education, and programming. For roughly eight months, Cintron also lacked access to newspapers and a mirror. Thus "deprived of almost any environmental or sensory stimuli,"

- 8 -

id., Cintron spent his days with no more than "a bed and a toilet" to keep him company.

RIDOC also made it difficult for Cintron to sleep: "The lights glared overhead 24 hours a day," and "there was a loud bang -- a door locking -- every thirty minutes, even at night." Cintron's sleep deprivation led him to begin "taking sleep medication (for the first time in his life)."

As Bibeault foresaw, Cintron deteriorated physically and mentally while in solitary. He lost seventy pounds, exhibited self-injurious behavior (including punching his cell walls and pulling out his hair), and suffered intrusive thoughts and severe anxiety. In addition to taking his newly prescribed sleep medication, Cintron began taking antidepressants for the second time in his life (the first time was during a prior stint in solitary) and abusing his prescription pain medication. RIDOC responded to these relapses not with treatment, but by booking him for additional infractions, thus extending his isolation.[4]

_____

[4] The parties seem to agree that Cintron spent 450 consecutive days in solitary stemming from his four disciplinary sentences in July and August 2019. In a February 2022 filing, Cintron alleged that he "has spent 950 days in High Security or in [solitary confinement] at Maximum Security," without specifying what portion of those 950 days (if any) he spent in nonsolitary high-security confinement. Additionally, Cintron's July 2023 opening brief states that he "spent two and a half years" in solitary and that RIDOC "continue[s] to cycle [him] in and out of solitary confinement." The precise length of Cintron's time in solitary -- whether 450 days or longer -- does not impact our resolution of this appeal.

While in solitary confinement, Cintron repeatedly asked for relief, but his pleas largely fell on deaf ears. He renewed his request for MAT enrollment to no avail. The limited treatment he did receive -- antidepressants and time with a social worker -- did little to improve his health.

After around four months in solitary confinement, Cintron beseeched Diniz, as warden of medium security, to suspend the remainder of his time in solitary. Diniz refused. Cintron wrote multiple letters to Defendant Jeffrey Aceto, the warden of high security, telling him about his psychiatric breakdowns and requesting that Aceto suspend his remaining time in solitary confinement. Aceto refused. Cintron's social worker likewise spoke with Aceto and Defendant Lynne Corry (then a deputy warden) about his deteriorating condition and asked that they suspend the remainder of his time in solitary. Both refused.

When Corry became the new warden of high security, Cintron wrote to her with a similar request. She responded in May 2020:

> I understand that you are going through things at this time however the way to suspend your discipline time is as easy as stop being disciplined. [The COVID-19 pandemic] is a difficult time for all, and sacrifices must be made for the greater health of all around us. Occupy your time by writing letters, journal things and share with [your social worker] are a few suggestions to occupy your time. Your

> actions and behavior are what is holding you
> back from a discipline time suspension.

## II.

Cintron filed the operative second amended complaint (the "complaint"), with counsel, in February 2021, attempting to state § 1983 claims for violations of the First, Fifth, and Eighth Amendments, as well as state tort law claims.[5]

Defendants moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), arguing, among other things, that Cintron's claims failed on their merits and that defendants were entitled to qualified immunity for his § 1983 individual-capacity monetary claims. In an August 2022 text order, the district court denied the motion as to four of Cintron's claims (including his Eighth Amendment claim), while granting it with Cintron's consent as to three claims. After defendants appealed, the parties agreed to dismiss all but Cintron's Eighth Amendment claim against all defendants.[6]

---

[5] Cintron filed an initial pro se complaint in September 2019.

[6] The parties' briefs feature one additional claim: a state tort abuse-of-process claim. However, the parties agreed to dismiss that claim prior to oral argument.

- 11 -

### III.

#### A.

Because Cintron's Eighth Amendment claim remains alive in the district court, this appeal is interlocutory. We enjoy jurisdiction over interlocutory appeals of qualified immunity denials and the related issues of law at bar. See Asociación de Subscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Flores Galarza, 484 F.3d 1, 13, 20, 23-25 (1st Cir. 2007) (exercising interlocutory jurisdiction over arguments concerning the denial of qualified immunity and related issues involving standing and § 1983 official-capacity claims).

#### B.

We treat a Rule 12(c) motion for judgment on the pleadings much like a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted. Pérez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008). We review the district court's judgment de novo, "accept[ing] all of the non-moving party's well-pleaded facts as true and draw[ing] all reasonable inferences in his favor." Rezende v. Ocwen Loan Servicing, LLC, 869 F.3d 40, 42 (1st Cir. 2017). We do not vary our approach even where, as here, the district court did not explain its reasoning. Cf. Camilo-Robles v. Hoyos, 151 F.3d 1, 8 (1st Cir. 1998) ("When the district court's order is unilluminating, the appellate court must fend for itself.").

- 12 -

Under Rule 12(c), a movant can secure judgment on the pleadings only when "it appears beyond a doubt that the nonmoving party can prove no set of facts in support of [his] claim [that] would entitle [him] to relief." Feliciano v. Rhode Island, 160 F.3d 780, 788 (1st Cir. 1998). To defeat a Rule 12(c) motion, a § 1983 plaintiff need not show probable victory, but he must plead "more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

## C.

Before proceeding to our analysis, we briefly delineate the scope of relief available to Cintron. First, as to Cintron's § 1983 damages claim, he can only seek such relief from defendants in their individual capacities. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 66, 70 (1989). Cintron conceded as much below. Thus, Cintron cannot assert a § 1983 damages claim against defendants in their official capacities, and we reverse the district court to the extent it held otherwise.[7] See Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 124 (1st Cir. 2003).

Second, defendants suggest that Cintron's complaint does not seek declaratory relief because its "Relief Requested" section omits declaratory relief. But the complaint's "Claims for Relief"

---

[7] This means that Cintron's damages claim against Salisbury, whom Cintron sues only in his official capacity, falls away completely.

- 13 -

section expressly requests "declaratory relief" for Cintron's Eighth Amendment claim. And defendants advance no argument concerning why we should elevate the "Relief Requested" section's silence over the "Claims for Relief" section's clarity.

Third, defendants argue that Cintron lacks standing to seek injunctive or declaratory relief, or that his claims to such relief are moot. Cintron clearly has standing to press the individual-capacity compensatory-damages claim that triggered the assertion of a qualified immunity defense. As to his other claims, though, we are sensitive to the fact that Cintron's carceral status may have changed since oral argument, and we thus consider ourselves ill-equipped to adjudicate his standing to pursue declaratory and injunctive relief, or the mootness of his claims thereto. We therefore leave it to the district court to determine, on remand and with the benefit of up-to-date submissions, whether it can properly entertain Cintron's declaratory and injunctive claims. Cf. Welch v. Shultz, 482 F.2d 780, 783 (D.C. Cir. 1973) (per curiam) (remanding to the district court where potential mootness issues necessitated "definition and examination afresh on an up-to-date factual record").

## IV.

Defendants argue that they enjoy qualified immunity from Cintron's Eighth Amendment individual-capacity monetary claim. Qualified immunity shields state officials "from liability for

civil damages insofar as their conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). To defeat qualified immunity, Cintron must show both "(1) that [a defendant] violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) (quoting Harlow, 457 U.S. at 818). Thus, in the context of this appeal predicated on a qualified immunity defense to Cintron's complaint, we focus, in order, on two questions: Does Cintron's complaint allege facts that make out a violation of his Eighth Amendment rights? And, if so, were those Eighth Amendment rights clearly established at the relevant time?

## A.

We consider first whether Cintron alleges an Eighth Amendment violation. "[A] prison official violates the Eighth Amendment only when two requirements are met." Farmer v. Brennan, 511 U.S. 825, 834 (1994). First, under the "objective" requirement, "the deprivation alleged must be, objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities" such that the plaintiff "is incarcerated under conditions posing a substantial risk of serious harm." Id.

- 15 -

(quotation marks and citations omitted). Second, under the "subjective" requirement, "a prison official must have a sufficiently culpable state of mind. In prison-conditions cases[,] that state of mind is one of deliberate indifference to inmate health or safety, a standard the parties agree governs the claim in this case." Id. (quotation marks and citations omitted).

In conducting the objective and subjective inquiries, we keep in mind Cintron's framing of his claim: Cintron does not argue that solitary confinement is per se unconstitutional. Rather, he claims that defendants violated the Eighth Amendment by continuing to confine him under conditions that they knew were causing him serious harm. In the words of his brief, "[t]ime and again, Cintron told [defendants] that solitary was harming him, yet they did nothing."

**1.**

We begin with the objective requirement. The Supreme Court long ago recognized that refusing an inmate "direct intercourse with or sight of any human being, . . . employment[,] or instruction" can force that inmate, "after even a short confinement, into a semi-fatuous condition, from which it [i]s next to impossible to arouse [him]," and may even push him to "violent[] insan[ity]" or "suicide." In re Medley, 134 U.S. 160, 168 (1890). Modern research substantiates this pronouncement. See, e.g., Craig Haney, The Psychological Effects of Solitary

- 16 -

Confinement: A Systematic Critique, 47 Crime & Just. 365, 370–78 (2018) (discussing this phenomenon and surveying on-point studies); Palakovic v. Wetzel, 854 F.3d 209, 225 (3d Cir. 2017) (acknowledging "the robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation"). Summarizing such research, the Third Circuit concluded, "in the absence of interaction with others, an individual's very identity is at risk of disintegration." Williams v. Sec'y Pa. Dep't of Corr., 848 F.3d 549, 566 (3d Cir. 2017).

The type of sensory deprivation that allegedly typified Cintron's solitary confinement only exacerbates these risks. As the Third Circuit has explained:

> Based on an examination of a representative sample of sensory deprivation studies, the researchers found that virtually everyone exposed to such conditions is affected in some way. They further explained that "there is not a single study of solitary confinement wherein non-voluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects." And as another researcher elaborated, "all individuals subjected to solitary confinement will experience a degree of stupor, difficulties with thinking and concentration, obsessional thinking, agitation, irritability, and difficulty tolerating external stimuli."

Id. (cleaned up). Similarly, the Fourth Circuit has labeled conditions that "deprive[] inmates of the basic human need for meaningful social interaction and positive environmental

- 17 -

stimulation" as "pos[ing] a substantial risk of serious psychological and emotional harm." Porter v. Clarke, 923 F.3d 348, 368 (4th Cir. 2019) (quotation marks and citation omitted).

Cintron's complaint also alleges that his conditions of confinement deprived him of the ability to sleep. "[S]leep is critical to human existence . . . ." Walker v. Schult, 717 F.3d 119, 126 (2d Cir. 2013). "It has been known since 1500 at least that deprivation of sleep is the most effective torture." Ashcraft v. Tennessee, 322 U.S. 143, 150 n.6 (1944) (citation omitted). Amicus Center for Law, Brain & Behavior at Massachusetts General Hospital cites over a dozen academic studies documenting the harmful effects of sleep deprivation.[8] As one writer succinctly summarizes, "[t]he brain starts to eat itself after chronic sleep deprivation."[9] Indeed, several of our sister circuits have allowed Eighth Amendment claims to proceed where the plaintiffs alleged sleep-deprivation tactics akin to those allegedly deployed against Cintron. See, e.g., Walker, 717 F.3d at 122, 126–27 (recognizing that "sleep is critical to human existence" and allowing an Eighth

---

[8] See, e.g., Christian Benedict et al., Acute Sleep Deprivation Increases Serum Levels of Neuron-Specific Enolase (NSE) and S100 Calcium Binding Protein B (S-100B) in Healthy Young Men, 37 Sleep 195 (2014); Vinod Venkatraman et al., Sleep Deprivation Elevates Expectation of Gains and Attenuates Response to Losses Following Risky Decisions, 30 Sleep 603 (2007).

[9] Andy Coghlan, The Brain Starts to Eat Itself After Chronic Sleep Deprivation, NewScientist (May 23, 2017), https://perma.cc/K2ZZ-KPBE.

Amendment claim to proceed where the plaintiff alleged that he "got almost no sleep . . . because the noise inside the cell was constant and loud" (cleaned up)); Allah v. Bartkowski, 574 F. App'x 135, 138-39 (3d Cir. 2014) (allowing an Eighth Amendment claim to proceed where the plaintiff alleged that loud noises "contribut[ed] to his sleep deprivation . . . 'for a lengthy or consistent period of time'"); Antonelli v. Sheahan, 81 F.3d 1422, 1433 (7th Cir. 1996) (allowing a due process or Eighth Amendment claim to proceed where the plaintiff alleged that "noise occurred every night, often all night, interrupting or preventing his sleep"); Keenan v. Hall, 83 F.3d 1083, 1090 (9th Cir. 1996) ("There is no legitimate penological justification for requiring inmates to suffer physical and psychological harm by living in constant illumination. This practice is unconstitutional." (cleaned up)); see also Garrett v. Thaler, 560 F. App'x 375, 378-80 (5th Cir. 2014) ("[C]onditions designed to prevent sleep may violate the Eighth Amendment.").[10]

Thus, the harm that Cintron alleges -- the mental and physical deterioration from long-term social, sensory, and sleep deprivation -- closely aligns with the types of injuries that other

---

[10] All five currently incarcerated amici echo Cintron's narrative of sleep deprivation, describing how "very few people sleep much in [solitary confinement]," in large part because of the "banging from doors opening and closing" and the fact that the "night light [is] kept on all night long."

courts have recognized as satisfying the Eighth Amendment's objective requirement. We therefore hold that Cintron has alleged the requisite objective harm to make out an Eighth Amendment claim -- that is, Cintron's complaint supportably asserts that RIDOC officials denied him "the minimal civilized measure of life's necessities" such that he was "incarcerated under conditions posing a substantial risk of serious harm." Farmer, 511 U.S. at 834 (citation omitted); see also Porter, 923 F.3d at 368 (outlawing conditions that "deprive[] inmates of the basic human need for 'meaningful social interaction and positive environmental stimulation'" (citation omitted)). We turn next to examining whether Cintron's complaint also alleges facts that satisfy the subjective requirement of an Eighth Amendment claim.

**2.**

The Eighth Amendment's subjective requirement mandates that a defendant "possessed a sufficiently culpable state of mind . . . amount[ing] to deliberate indifference to the claimant's health or safety." Zingg v. Groblewski, 907 F.3d 630, 635 (1st Cir. 2018). "Deliberate indifference is characterized by 'obduracy and wantonness, not inadvertence or error in good faith.'" Leite v. Bergeron, 911 F.3d 47, 52 (1st Cir. 2018) (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)). "To show such a state of mind, [Cintron] must provide evidence that [a given defendant] had actual knowledge of impending harm, easily

preventable, and yet failed to take the steps that would have easily prevented that harm." Zingg, 907 F.3d at 635 (quotation marks and citation omitted).

The subjective requirement poses "a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." Farmer, 511 U.S. at 842. "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id. This inquiry focuses on the conduct of each official to determine whether any given official "acted or failed to act despite his knowledge of a substantial risk of serious harm." Id.

We read Cintron's complaint to sufficiently allege only that Aceto, Corry, and Kettle knew of his deterioration in solitary and possessed the authority to end the conditions causing that deterioration. Aceto, Corry, and Kettle held supervisory positions at RIDOC and plausibly must have known, at least in general terms, the nature of RIDOC's solitary confinement -- i.e., that it involved conditions, like severe social, sensory, and sleep deprivation, that risk serious mental and physical harm. And Cintron adequately alleges that these three officials knew that such risk had become reality for Cintron. Specifically, Cintron contends that he and his social worker both informed Aceto and Corry about his deteriorating condition and requested early release from solitary. And he alleges that he appealed his

solitary confinement several times to Kettle, who has admitted that in reviewing such appeals, he "talk[s] to the staff members [to see] how [the inmate is] doing."

We therefore turn our attention to what Cintron alleges that Aceto, Corry, and Kettle did or did not do after gaining the requisite knowledge. Cintron contends that they each refused to suspend the remainder of his time living under the conditions causing his deterioration, and that Corry instructed him to "[o]ccupy [his] time by writing letters, journal[ing] things[,] and shar[ing] with [his social worker]." He further contends that RIDOC, as an institution, provided only modest medical treatment -- psychopharmacologic drugs and sessions with a social worker -- otherwise leaving his conditions of confinement unchanged. In fact, Cintron alleges that RIDOC extended his solitary confinement in direct response to an untreated symptom of his opioid use disorder -- his abuse of prescription pain medication while in solitary.

Case law makes clear that prison officials may impose certain harmful conditions on a prisoner if they have a "legitimate penological justification" for so doing. Porter, 923 F.3d at 362-63. "[S]ecurity and administration" concerns can constitute one such justification. Kosilek v. Spencer, 774 F.3d 63, 83-84 (1st Cir. 2014) (en banc) (citation omitted). Defendants argue that such is the case with solitary confinement, which they say they

- 22 -

employ to help fulfill their "duty to maintain prison order, discipline inmates for serious offenses they commit, and combat narcotics consumption and trafficking that risks inmates' lives." See Porter, 923 F.3d at 362-63.

Cintron, though, does not argue that solitary confinement in all its forms is per se unconstitutional. Rather, he trains his attention more narrowly, pointing to the particular conditions that allegedly typified his solitary confinement in RIDOC's ACI -- long-term social, sensory, and sleep deprivation. And even as to those conditions, he focuses not on the conditions per se, but on defendants' alleged failure to ameliorate them even when his deterioration became manifest.

Defendants respond by insisting that "[r]eturning [Cintron] to the general population before the completion of his disciplinary sentence after he trafficked fentanyl into the prison and while he admittedly was continuing to abuse substances would have created an obvious and immediate danger for both Cintron and other inmates." While we acknowledge "the deference owed to prison administrators" when they make disciplinary decisions, Kosilek, 774 F.3d at 93, Cintron's long-term solitary confinement self-evidently caused rather than prevented an "obvious and immediate danger" to Cintron himself. And while officials can justify removing a prisoner from the general population to improve the safety of other inmates, they cannot -- in the face of that

prisoner's deterioration -- perpetuate the kind of social, sensory, and sleep deprivation that Cintron alleges.

As to those deprivations, defendants defend as "not necessary for a civilized life," Rahman X v. Morgan, 300 F.3d 970, 974 (8th Cir. 2002), some of the items of which they allegedly deprived Cintron: a mirror, newspapers, a radio, a desk, a television, and an MP3 player. But in ninety-seven pages of appellate briefing, defendants point to no legitimate penological need to interfere systematically with Cintron's sleep or to maintain such a high degree of isolation and sensory deprivation. In this manner, defendants waive -- at least for the purposes of their motion for judgment on the pleadings -- any argument that there exists a legitimate penological justification for subjecting Cintron to these alleged conditions in the face of his deterioration. See Gonzalez-Morales v. Hernandez-Arencibia, 221 F.3d 45, 51 n.7 (1st Cir. 2000) (providing that "arguments not developed are waived").

We therefore conclude that Cintron plausibly alleges facts that, if true, would establish that Aceto, Corry, and Kettle violated his Eighth Amendment right against cruel and unusual punishment. He has, however, not done so vis-à-vis any other defendant under his theory of the case, so we reverse the district court insofar as it allowed Cintron's individual-capacity monetary

- 24 -

claim to proceed against Bibeault, Cabral, Coyne-Fague, and Diniz.[11]

### B.

We must now determine whether, at the time Aceto, Corry, and Kettle allegedly allowed Cintron to deteriorate from the deprivations he claims he experienced in solitary, it was clearly established that the Eighth Amendment bars such treatment. Throughout our analysis above, we rely exclusively on authority predating defendants' actions at issue. As we conclude below, those authorities were sufficient to put Aceto, Corry, and Kettle on notice both that solitary confinement of the type alleged by Cintron can seriously harm prisoners and that prison officials may not respond indifferently to such harm once it manifests.

For the purposes of qualified immunity, a right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing

---

[11] In so holding, we do not mean to imply any approval of Bibeault's, Cabral's, Coyne-Fague's, or Diniz's alleged conduct. Under different theories of the case, Cintron very well might be able to make out claims against some of these defendants -- especially Bibeault, whose alleged threats to Cintron's mental health strike us as particularly pernicious. But Cintron presses a claim grounded in defendants' alleged indifference to his ongoing deterioration, and he asserts facts showing only that Aceto, Corry, and Kettle knew of that deterioration and could have ended it. Notably, Cintron does not allege any facts showing that he or anyone else informed Diniz of his deterioration, nor does he allege facts showing that Bibeault had any role in (or knowledge of) the responses to Cintron's deterioration as it developed.

- 25 -

violates that right." Mullenix v. Luna, 577 U.S. 7, 11 (2015) (per curiam) (citation omitted). Although a plaintiff need not point to "a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." White v. Pauly, 580 U.S. 73, 79 (2017) (per curiam) (quotation marks and citation omitted). In adjudicating this requirement, we look mainly to Supreme Court and First Circuit precedent, see Stamps v. Town of Framingham, 813 F.3d 27, 40 (1st Cir. 2016), while also considering cases from other courts, see Wilson v. Layne, 526 U.S. 603, 616-17 (1999), and certain non-case-law sources, like statutes, see Eves v. LePage, 927 F.3d 575, 587 (1st Cir. 2019), prison regulations, see Hope v. Pelzer, 536 U.S. 730, 743-44 (2002), and government studies and reports, see id. at 744-45.

Importantly, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Id. at 741. "Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of cases with 'materially similar' facts." Id. Thus, even without such similarity, we may find evidence that "the state of the law in [2019] gave [defendants] fair warning that their alleged treatment of [Cintron] was unconstitutional." Id.

- 26 -

Applying this framework, we hold that it was clearly established, as of 2019, that Cintron's alleged conditions of continued confinement violate the Eighth Amendment's objective requirement. We reach this holding most easily as to Cintron's allegations of prolonged sleep deprivation. As of 2019, at least four courts of appeals had recognized the unlawfulness of the type of sleep-deprivation tactics alleged by Cintron. See Walker, 717 F.3d at 122, 126-27; Allah, 574 F. App'x at 138-39; Antonelli, 81 F.3d at 1433; Keenan, 83 F.3d at 1090-91; see also Wilson, 526 U.S. at 617 (indicating that "a consensus of cases of persuasive authority" can demonstrate "that a reasonable officer could not have believed that his actions were lawful"). And the Supreme Court itself had described such tactics as "the most effective torture." Ashcraft, 322 U.S. at 150 n.6 (citation omitted).

As of 2019, several courts of appeals had also recognized that prolonged social and sensory deprivation pose objectively grave threats to inmates' health. See, e.g., Porter, 923 F.3d at 360-61; Williams, 848 F.3d at 566-67. These holdings followed (and heavily relied on) a chorus of "studies and scholarly articles . . . demonstrating that prolonged isolated confinement, under conditions closely analogous to those [Cintron] challenge[s], creates a substantial risk of psychological and emotional harm." Porter, 923 F.3d at 360-61; Williams, 848 F.3d at 566-69. As Cintron documents in his brief, leaders of Rhode

Island -- and of RIDOC itself -- had acknowledged by 2019 the dangers of social and sensory deprivation in solitary confinement. A 2017 report, commissioned by Rhode Island's legislature to study and assess the use of solitary at the ACI, found:

> [Community members] shared personal experiences of the lasting negative impact of their isolation, or that of a loved one, on their mental and physical health. In addition, many community members noted that those who are sentenced to solitary confinement often suffer from profound mental health issues even before their incarceration. In this regard, they testified that solitary confinement served to exacerbate those pre-existing issues rather than to serve any rehabilitative purpose, which they offered as counter to the goals of the greater community who will receive these very individuals in society upon their release from the ACI.
>
> The commission also heard from experts in both medical and psychiatric fields regarding the physical and psychological impact of solitary confinement on a prisoner. Presenters offered testimony on recent research studies which showed that prolonged isolation causes higher rates of psychiatric hospitalization, sleeplessness, anxiety, depression and suicidal thoughts among prisoners. Additional research studies noted negative physiological effects on prisoners to include loss of appetite, lethargy and diminished impulse control.

Report of the Special Legislative Commission to Study and Assess the Use of Solitary Confinement at the Rhode Island ACI 6 (June 29, 2017). Viewing the overall landscape as of 2019 -- in particular, the legislative report addressing the deleterious effects of solitary at the very facility at which Cintron was imprisoned -- we

- 28 -

conclude that any reasonable officer would have known in 2019 that prolonged social and sensory deprivation "pos[e] a substantial risk of serious harm" to inmates. Farmer, 511 U.S. at 834.

We also conclude that it was clearly established, at the time Aceto, Corry, and Kettle allegedly ignored Cintron's pleas for help, that prison officials may not respond indifferently to an inmate's deterioration under objectively harmful conditions of confinement. The Supreme Court held as much over thirty years ago. See id. (providing that the Eighth Amendment bars "deliberate indifference" to an inmate's injuries accrued "under conditions posing a substantial risk of serious harm" (citation omitted)); see also Estelle v. Gamble, 429 U.S. 97, 104 (1976) ("Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." (cleaned up)).

Defendants do not argue that this rule of law was not clearly established as of 2019. Instead, they contend that no pre-2019 case law clearly established "that a prison official is required to suspend an inmate's disciplinary sentence in circumstances where that inmate committed multiple, serious disciplinary offenses." True enough. But we do not here hold that the Eighth Amendment required defendants to grant Cintron's specific suspension requests. Instead, we hold simply that the Eighth Amendment barred defendants from responding to those

- 29 -

requests with complete indifference. Defendants had several options short of suspension that may well have cured the alleged objectively harmful conditions of confinement, but Cintron asserts that they deliberately selected none of those options.

Finally, we note that defendants invoke several District of Rhode Island decisions that they claim approved of solitary confinement akin to that alleged by Cintron. But defendants overread the case law. In Harris v. Perry, the court rejected an Eighth Amendment claim challenging prolonged solitary, but in so doing, the court opined simply on solitary confinement in the broadest sense (i.e., disciplining a prisoner by separating him from the general population). See No. 15-cv-00222, 2015 WL 4879042, at *5 (D.R.I. July 15, 2015). The plaintiff there made no allegations evincing unconstitutionally harsh conditions or deliberate indifference to any harm arising therefrom. See id. at *3. In Rodriguez v. Cabral, the court rejected as insufficient to support an Eighth Amendment claim the plaintiff's bare allegation that "his period in [solitary] caused his mental health issues to worsen." No. 16-cv-00203, 2018 WL 1449515, at *3 (D.R.I. Mar. 23, 2018). And in Paye v. Wall, the court rejected the plaintiff's Eighth Amendment challenge, pointing out that the plaintiff did "not demonstrate[], or even allege[], that he was subjected to inhumane conditions during" his solitary confinement. No. 17-cv-00193, 2018 WL 4639119, at *3 (D.R.I. Sept. 27, 2018). In none of

those cases did the plaintiffs come remotely close to making out Eighth Amendment claims predicated on the type of social, sensory, and sleep deprivation that Cintron alleges.  Defendants therefore find no shelter in this case law.

Thus, we conclude that Aceto, Corry, and Kettle have not demonstrated their entitlement to qualified immunity from Cintron's Eighth Amendment claim.

**V.**

For the foregoing reasons, we <u>affirm</u> the district court's August 2022 text order in part, <u>vacate</u> and <u>remand</u> it in part, and <u>reverse</u> it in part.  We <u>affirm</u> the order insofar as it allowed Cintron's Eighth Amendment monetary claim against Aceto, Corry, and Kettle in their individual capacities to proceed.  We <u>vacate</u> it insofar as it allowed Cintron's Eighth Amendment declaratory and injunctive claims against those three defendants in their official capacities to proceed and <u>remand</u> those claims for renewed standing/mootness analysis.  And we otherwise <u>reverse</u> the order in full.  The parties shall bear their own costs.